**CLAJON PRODUCTION CORPORATION; Marion H. and Mary C. Scott, husband and wife; and Salt Creek Ranch, L.L.C., a Wyoming limited liability corporation, Plaintiffs,**

v.

**Pete E. PETERA, Director of the Wyoming Game and Fish Department, in his personal capacity; Jay Lawson, Chief Game Warden of the Wyoming Game and Fish Department, in his personal capacity; and Dan Kennedy, Kevin Dooley, Mike Hunzie, Hal Corbett, Mary Flitner, Kari Priewe, and David Steger, members of the Wyoming Game and Fish Commission, in their personal capacities, Defendants.**

No. 93–CV–0223–B.

United States District Court,
D. Wyoming.

June 8, 1994.

James R. Scarantino, Albuquerque, NM, Franklin J. Falen, Cheyenne, WY, for plaintiff.

Ron Arnold, Sr. Asst. Atty. Gen., Mary B. Guthrie, Deputy Atty. Gen., Kristi Sansonetti, Asst. Atty. Gen., Cheyenne, WY, for defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

BRIMMER, District Judge.

The above-entitled matter having come before the Court on the Defendants' Motions for Summary Judgment, and the Plaintiffs' Oppositions thereto; and the Plaintiffs' Cross–Motion for Partial Summary Judgment, and the Defendants' Opposition thereto; and the Court, having considered the materials on file both in support thereof and in opposition thereto, having heard oral argument from the parties, and being fully advised in the premises, hereby FINDS and ORDERS as follows:

#### Procedural Background

This lawsuit involves various federal constitutional challenges to the regulatory scheme governing the allocation and distribution of hunting licenses within the State of Wyoming.[1] At its core, this case raises difficult and fundamental questions regarding the relationship between sovereign and private citizen over one of the oldest and most sacred rights possessed in a democratic society, the right to own and use real property.

On August 2, 1993, the plaintiffs in this matter, Clajon Production Corporation ("Clajon"), Marion H. and Mary C. Scott (the "Scotts"), and the Salt Creek Ranch, L.L.C. ("SCR"), filed the present suit. Clajon, a Texas corporation, is a wholly-owned entity of Clajon Holdings Corporation, a Delaware corporation controlled by the Clayton W. Williams, Jr. family of Texas. Clajon owns in excess of 90,000 acres in Carbon County, Wyoming. The Scotts are residents of Campbell County, Wyoming, near the city of Gillette, where they own and operate a ranch of around 8,400 deeded acres plus a neighboring ranch of several thousand acres, which they lease from Mr. Scott's father, the owner of the land. SCR is a family-owned and operated ranch which owns over 40,000 acres in Natrona and Converse Counties within the state of Wyoming, near the town of Edgerton. It is undisputed that the plaintiffs' landholdings encompass numerous acres of wildlife habitat which support sizeable numbers of wild animals and big game, including elk, deer and antelope.[2]

The plaintiffs' initial complaint named the State of Wyoming and the Wyoming Game and Fish Commission (the "Commission") as defendants and sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 (1988). The plaintiffs alleged that several existing rules and regulations governing the distribution and allocation of hunting licenses in Wyoming were unconstitutional. On Au-

---

**1.** In addition to the federal constitutional claims, the complaint also alleges numerous violations of the Wyoming Constitution. It cannot be disputed that this Court possesses subject matter jurisdiction, that is, power, to hear these claims pursuant to the Court's "pendent" or, more accurately, "supplemental" jurisdiction. See 28 U.S.C. § 1367(a) (West Supp.1994). Nonetheless, this Court declines to exercise its jurisdiction over these claims because they involve "novel or complex issue[s] of State law[.]" 28 U.S.C. § 1367(c)(1).

It is hard to imagine issues that are more within the province of the state courts than issues requiring interpretation of the state's own constitution. Because there is little if any decisional law interpreting these provisions of the Wyoming Constitution, this Court declines to address the plaintiffs' state constitutional challenges in the interests of federalism and comity. See, e.g., Escobar v. Landwehr, 837 F.Supp. 284, 290 (W.D.Wis.1993) (declining to exercise supplemental jurisdiction over state constitutional claims after federal constitutional claims have been resolved); Freund v. Florio, 795 F.Supp. 702, 710–11 (D.N.J.1992) (same).

**2.** The defendants represented to the Court that approximately 49 percent of the land within the State of Wyoming is privately owned.

gust 25, 1993, the State of Wyoming and the Commission moved to dismiss the complaint on the grounds that they were immune from suit under the Eleventh Amendment. Before this Court issued a ruling on that motion, the plaintiffs amended their complaint to name individuals members of both the Commission and the Wyoming Game and Fish Department (the "Department") as defendants, rather than the State and the Commission as entities.[3] The only difference between the original and amended complaints was in the named defendants; the substance of the amended complaint, and the claims contained therein, were identical to those raised in the original complaint.

On November 17, 1993, a motion was filed on behalf of eleven groups and individuals who sought leave to intervene permissively pursuant to Rule 24(b)(2) on behalf of the defendants in this action. The applicant-intervenors are the National Wildlife Federation; the Wyoming Wildlife Federation; the Wyoming Outdoor Council; the Dubois Wildlife Association; the Heart Mountain Wildlife Association; the Greater Yellowstone Coalition; the Medicine Butte Wildlife Association; the Wyoming Chapter of the Sierra Club; Orion, The Hunters Institute; Taylor Outfitters; and Phyllis Atchison.

In support of their motion to intervene, these conservation and hunting organizations advised this Court that they represent over 12,000 people in Wyoming along with over a million individuals outside of the state. These applicants further stated that they all possessed an interest in the subject matter of this litigation and that is why they sought leave for permissive intervention. Although the plaintiffs opposed the motion to intervene, this Court nonetheless exercised its discretion and granted the motion to intervene at oral argument on this matter, finding that the applicants satisfied the criteria set forth in Rule 24(b)(2). *See N.A.A.C.P. v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973) (noting that rulings on motions to intervene are subject to review only for an abuse of discretion). As a result, the applicants now hold the status of intervenor-defendants.

The plaintiffs' amended complaint challenges the constitutionality of Wyoming's statutory and regulatory scheme for allocating hunting licenses under the so-called "negative" commerce clause,[4] the equal protection clause of the Fourteenth Amendment[5] and the takings clause of the Fifth Amendment.[6] Specifically, the plaintiffs argue that § 23–1–103, along with §§ 3 and 6 of chapter XLIV of the Commission's regulations, are unconstitutional. In order to understand fully the basis for these claims, it will be necessary to

---

**3.** It is well-settled that "a suit by private parties seeking to impose liability *which must be paid from public funds in the state treasury* is barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (emphasis added). In so holding, *Edelman* expressly reaffirmed the principle that "the Eleventh Amendment [does] not bar an action in the federal courts seeking [prospective injunctive relief]." *Id.* at 664, 94 S.Ct. at 1356 (citing *Ex Parte Young*, 209 U.S. 123, 148–50, 28 S.Ct. 441, 449–50, 52 L.Ed. 714 (1908)).

Although the complaint in this case seeks declaratory and injunctive relief, it was amended by the plaintiffs to name individual defendants rather than entities. Accordingly, the validity of the defendants' motion to dismiss on Eleventh Amendment grounds is moot by virtue of the amended complaint and as a result, this Court need not opine on the merits of that motion.

**4.** The Constitution provides that "[t]he Congress shall have power ... [t]o regulate Commerce ... among the several States[.]" U.S. Const. art. I,

§ 8, cl. 3. Although "a literal reading [of this clause] evinces a grant of power to Congress, the commerce clause also directly limits the power of the states to discriminate against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992); *Welton v. Missouri*, 91 U.S. 275, 279–83, 23 L.Ed. 347 (1876); *see also Guschke v. City of Oklahoma City*, 763 F.2d 379, 384 (10th Cir. 1985) (citation omitted).

It is this "negative sweep" of the Commerce Clause, *see Quill Corp. v. North Dakota*, 504 U.S. ——, ——, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992), that is, the portion limiting the power of the states to discriminate unjustifiably or burden interstate commerce, that is implicated in this case.

**5.** "[N]or shall any State ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

**6.** "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

review briefly the regulatory scheme regarding licensing that presently exists in Wyoming.

## Factual Background

### A. The Legislative and Administrative Framework

Over fifty years ago, the state legislature enacted a comprehensive statutory framework to regulate the taking of wildlife within the State of Wyoming. *See generally* Wyo. Stat. §§ 23–1–101 to –901 (1991). The purpose of this legislation was to codify the "policy of [the State of Wyoming] to provide an adequate and flexible system for control, propagation, management, protection and regulation of all Wyoming wildlife[.]" *See* Wyo.Stat. § 23–1–103 (1991), *quoted in O'Brien v. State*, 711 P.2d 1144, 1148 (Wyo. 1986). In recognition of the fact that wildlife is a valuable and depletable natural resource, § 23–1–103 expressly provides that "all wildlife in Wyoming is the property of the state." In their motion for summary judgment, the defendants correctly concede that this declaration of ownership does not purport to be a claim of actual proprietary ownership of the wildlife, but rather, constitutes a claim of ownership by the state in its sovereign capacity for the common benefit and interest of all of its citizens. Defendants' Motion for Summary Judgment, Oct. 5, 1993, at 11 (citing *O'Brien*, 711 P.2d at 1149 (discussing § 23–1–103)).

Part of the legislature's means for achieving their expressed goals and furthering the policies discussed above included the creation of an administrative entity within the executive branch, the Commission[7] and a subentity under its control, the Department,[8] both of which were designed to oversee and implement the legislative will at a hands-on level. The function of these agencies was to be achieved by way of a delegation of lawmaking authority from the legislature to them. *See, e.g.,* Wyo.Stat. § 23–1–302(a)(xiv) and (xxii)[9] (1991) (delineating the scope of the Commission's powers and duties); Wyo. Stat. § 23–1–303(e) (noting that rules and regulations of the Commission and the Department must comply with the Wyoming Administrative Procedure Act ("WAPA")).

A separate section of this legislative plan states that an individual must obtain a state hunting license in order to take big game lawfully. *See* Wyo.Stat. § 23–2–101(a) (1991). It thus became evident that part of the responsibilities of the Commission and the Department would include promulgation of rules and regulations governing the requirements for, and distribution of, licenses to individuals who wished to hunt wildlife within the state.[10]

In compliance with the WAPA, the Commission and the Department exercised their lawmaking powers and eventually enacted a set of regulations entitled "Chapter XLIV: Regulation for Issuance of Licenses." Sections 3, 5 and 6 of these regulations are implicated in this lawsuit.[11]

The formula used by the Commission for determining the number of licenses to be made available in a given year is calculated based on an assessment of the game population for each particular species of game and accounts for certain conservationist and poli-

---

7. *See* Wyo.Stat. § 23–1–201 (1991) (creating the Commission).

8. *See* Wyo.Stat. § 23–1–401(a)–(b) (creating the Department and noting that it acts under the direction and supervision of the Commission).

9. Section 23–1–302 is a general grant of authority to the Commission which is entitled "Powers and Duties." Subsections (xiv) and (xxii) are the most relevant subsections to the case at bar, as they provide, respectively, that the Commission is empowered to "prescribe the requirements ... for the licenses[,] ... to issue licenses under the provisions of this act, to make regulations for the sale ... of licenses ... and to distribute licenses"

and that the Commission may "promulgate such orders as [it] considers necessary to carry out the intent of this act."

10. The importance of administrative action regarding licensing is self-evident. According to the deposition testimony of defendant Lawson, the Chief Game Warden of the Department, the sale of hunting licenses in Wyoming results in annual revenues in excess of $10,000,000.

11. Although the plaintiffs only challenge the portion of § 6 dealing with non-resident licensing, this claim also necessarily encompasses a challenge to the portion of § 5 that deals with resident licensing.

cy-oriented goals with respect to each species. The Commission must then compare the total number of licenses which it determines to make available with the number of licenses that are sought. Obviously, if the number of licenses made available is greater than the number sought, then every applicant will receive a license. If, however, the number of licenses made available is less than the number of licenses sought, then the regulations make it clear that a random computer selection is utilized to determine who will receive licenses.

Section 3 of the regulation provides a special means of granting additional licenses for landowners, and it expressly applies to individual and corporate landowners, resident and non-resident alike. It was adopted pursuant to a recent statutory amendment, which directs the Commission to promulgate additional rules governing the issuance of certain big game licenses to Wyoming landowners "without subjection to prescribed means of competitive public issuance." *See* Wyo.Stat. § 23–1–302(h) (Michie Supp.1993). The regulation that was ultimately adopted, § 3, permits a landowner who meets certain qualifications to apply for up to two hunting licenses per species of game without having to participate in the random computer selection that might otherwise govern the distribution of licenses. In order to be eligible for these landowner licenses, paragraph two of the regulation requires that the land owned by the individual meet certain criteria, one of which is that their landholdings involve at least 160 contiguous acres in Wyoming. This is the portion of the regulation that is at issue in this case.

Section 6 of the regulations is also at issue. Paragraph five of that section expressly provides that in certain areas, known as "limited quota areas," (which the plaintiffs' landholdings are), only 20 percent of the hunting licenses for deer, antelope, mountain lion and wild turkey, and only 16 percent of the hunting licenses for elk, are reserved for non-

residents. Section 5 makes it clear that the remaining 80 and 84 percent of the licenses, respectively, are reserved for Wyoming residents.

### B. *The Claims in this Case*

With this understanding of Wyoming's regulatory licensing scheme, it is now appropriate to turn to the particular claims raised by the plaintiffs in this case.

The plaintiffs' amended complaint first challenges the portion of § 23–1–103 which declares that the State of Wyoming owns all wildlife in the state, albeit as trustee for its citizens in the exercise of its sovereign authority. The plaintiffs initially contend that the state's assertion of ownership is invalid under *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). They also allege that by virtue of the common law property doctrines of *property ratione soli, profit a prendre* and the right of venery, they own the exclusive right to hunt the wild animals that are present on their property, and that as such, this statute unconstitutionally takes their property in violation of the Fifth Amendment.

The second challenge brought by the plaintiffs alleges that Wyoming's landowner regulation, § 3, which provides that certain qualified owners of land within the State of Wyoming may apply for up to two additional hunting licenses by virtue of their status as landowners, violates the equal protection clause of the Fourteenth Amendment and the takings clause because it restricts landowners to no more than two licenses regardless of the size of their landholdings.

The third and final challenge raised by the plaintiffs is to § 6, which limits the number of big game licenses available to non-residents to either 16 or 20 percent. The plaintiffs assert that this regulation detrimentally affects their ability to sell their hunting services to non-residents, and that this discrimination against commerce violates the negative commerce clause.[12]

---

**12.** One point should be mentioned about the challenge to regulation XLIV, § 6. At no time in their pleadings did the state defendants ever specifically address this aspect of the plaintiffs' argument. At oral argument, the defendants al-

leged that the first time that they heard of the challenge to this regulation was at the hearing and that the Court should not consider this argument because of the plaintiffs' "sandbagging."

The defendants have moved for summary judgment on all of the plaintiffs' claims. In addition, the plaintiffs have filed a cross-motion for partial summary judgment with respect to the claims regarding regulation XLIV, § 6.

This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 (1988), 42 U.S.C. § 1983 (1988) and 28 U.S.C. § 2201 (1988), and over the state constitutional claims pursuant to 28 U.S.C. § 1367(a) (West Supp.1994). Venue is proper pursuant to 28 U.S.C. § 1391(b) (West Supp.1994) and based on the defendants' failure to raise any objection to this Court's exercise of personal jurisdiction over them, any potential objection thereto has been waived pursuant to Rule 12(h)(1).

### Standard of Review

The standard for summary judgment is well-established and need not be recited in great detail. *See Central Wyoming Law Assoc's, P.C. v. Denhardt,* 836 F.Supp. 793, 798 (D.Wyo.1993) (Brimmer, J.); *White v. Continental General Ins. Co.,* 831 F.Supp. 1545, 1551–52 (D.Wyo.1993) (Brimmer, J.). "By its very terms, [the Rule 56(c) ] standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510; *see also Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir.1987). Summary judgment may be entered "against a party who fails to

make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Carey,* 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey,* 812 F.2d at 623. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir.1981).

### Discussion

#### A. Challenges to § 23–1–103

The plaintiffs first challenge the constitutionality of § 23–1–103 under the negative commerce clause and the takings clause.

#### 1. Commerce Clause Claim under Hughes

■ As noted above, the first claim involves a challenge under *Hughes* to § 23–1–103, as interpreted by the Wyoming Supreme Court in the *O'Brien* decision. The plaintiffs claim that the statute's declaration that the state "owns" wild animals, albeit in its capacity as sovereign for the benefit of the citizens of this state, is unconstitutional.

After careful consideration of this issue, this Court concludes that, although not cited by any of the parties, the Tenth Circuit's decision in *Mountain States Legal Foundation v. Hodel,* 799 F.2d 1423 (10th Cir.1986) (*en banc* ), is dispositive on this particular issue. In *Hodel,* Judge McKay wrote:

[i]t is well-settled that wild animals are not the private property of those whose land they occupy, but are instead a sort of common property whose control and regulation are to be exercised 'as a trust for the benefit of the people.' *Geer v. Connecti-*

---

The fact of the matter is that although the plaintiffs' amended complaint does not specifically refer to this regulation by number (i.e., as regulation XLIV, § 6), count four, paragraphs 45 and 46, are sufficient to have placed the defendants on notice that the plaintiffs were challenging this regulation. Therefore, the Court de-

clines the defendants' request not to consider this claim since it was and is properly before it. The fact that the defendants did not correctly understand the nature of this claim does not convert the plaintiffs' efforts to raise it into an unfair exercise in "sandbagging."

*cut,* 161 U.S. 519, 528–29 [16 S.Ct. 600, 604, 40 L.Ed. 793] (1896), *overruled on other grounds, Hughes v. Oklahoma,* 441 U.S. 322 [99 S.Ct. 1727, 60 L.Ed.2d 250] (1979).[5] ... Neither state nor federal authority over wildlife is premised upon any technical 'ownership' of wildlife by the government. Although older decisions sometimes referred to government 'ownership' of wildlife, that language has been deemed 'a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate an important resource.' *Toomer v. Witsell,* 334 U.S. 385, 402 [68 S.Ct. 1156, 1165, 92 L.Ed. 1460] (1948). As the Supreme Court declared, '[I]t is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government ... has title to these creatures until they are reduced to possession by skillful capture.' *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 284 [97 S.Ct. 1740, 1751, 52 L.Ed.2d 304] (1977) (citing *Missouri v. Holland,* 252 U.S. 416, 434 [40 S.Ct. 382, 383, 64 L.Ed. 641] (1920)); *Geer,* 161 U.S. at 539–40 [16 S.Ct. at 608–09] (Field, J., dissenting).

---

[5] *Hughes* overruled the narrow holding of *Geer* by rejecting the view that a state, without violating the Commerce Clause of the Constitution, may prohibit the export of wildlife lawfully taken within the state.

*Hodel,* 799 F.2d at 1426–27.

Footnote five of that opinion is of particular importance. In that footnote, the Tenth Circuit characterized the holding of *Hughes* narrowly, even though it is arguably broader. Nonetheless, the *Hodel* decision represents binding precedent that squarely rejects the plaintiffs' claims that this statute violates the negative commerce clause. *Hodel* upheld such a claim on the notion that such a claim of ownership is nothing more than a shorthand expression for preserving the state's power to regulate natural resources within its borders, a power expressly recognized in *Hughes* itself. *See Hughes,* 441 U.S. at 335–36, 99 S.Ct. at 1735–36 ("At the same time, the general rule we adopt in this case makes ample allowance for preserving, in ways not

inconsistent with the commerce clause, *the legitimate state concerns for conservation and protection of wild animals underlying the 19th-century legal fiction of state ownership.*") (emphasis added). Thus, even though claims of ownership may be "pure fantasy," the state's ability to exercise its police powers to regulate this resource is unaffected. Therefore, the defendants are entitled to summary judgment on this claim.

### 2. *Takings Claims*

The plaintiffs have also asserted that this statute effectuates a taking of their property in two respects: (1) they allege that they own the exclusive right to hunt the animals that are on their land by virtue of the common law property doctrines of *property ratione soli, profit a prendre* and the right of venery, and that the state has taken this exclusive right to hunt from them without compensation;[13] and (2) they argue that if the state owns the wildlife, then both the animals' actual presence on the plaintiffs' land and the animals' consumption of the forage on the plaintiffs' land constitute physical takings. These claims are without merit.

■ Prior to Justice Holmes' seminal opinion in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the takings clause had been thought to apply only to "direct appropriations" of property or the "functional equivalent of a 'practical ouster of [the owner's] possession.'" *See Lucas v. South Carolina Coastal Council,* 505 U.S. ——, ——, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798 (1992) (citing *Legal Tender Cases,* 79 U.S. (12 Wall.) 457, 551, 20 L.Ed. 287 (1871) and *Transportation Co. v. Chicago,* 99 U.S. 635, 642, 25 L.Ed. 336 (1879)). Since *Mahon,* however, the Supreme Court has recognized that in some cases, permissible regulatory action by the state which "goes too far" in redefining the range of interests included in the ownership of property may constitute a taking. *See Lucas,* —— U.S. at ——, 112 S.Ct. at 2892 (citing *Mahon,* 260 U.S. at 414–15, 43 S.Ct. at 159–60). Thus, regulations that compel a property owner to endure a physical

---

**13.** In other words, the property interest that the plaintiffs allege has been taken is not an interest in the wildlife *per se,* but rather their alleged interest in the right to hunt that wildlife.

invasion of his property constitute a taking under the Fifth Amendment. *E.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–40, 102 S.Ct. 3164, 3175–79, 73 L.Ed.2d 868 (1982). In addition, regulations that deny a landowner "all economically beneficial or productive use of land" may constitute a taking even in the absence of a direct physical invasion. *See Lucas,* —— U.S. at ——, 112 S.Ct. at 2893 (citations omitted).

### a. *Regulatory Takings Claim*

■ The plaintiffs' first claim that a taking has occurred must clearly fail based on the fact that the state possesses the right to regulate the wildlife within its borders in the exercise of its police powers. *Hughes* and *Hodel* make it apparent that a state's claim of trustee ownership in its sovereign capacity must not be viewed as anything more than a way of saying that a state may exercise its police powers to regulate important resources on behalf of its citizens. While *Lucas* recognizes that in some cases, regulations that go "too far" may be actionable under the takings clause, the decision explicitly holds that this type of regulatory action would constitute a taking only if it denied the plaintiffs' "all" economically viable use of their property. *See Lucas,* —— U.S. at ——–——, 112 S.Ct. at 2893–94 (citations omitted). No such claim has been advanced by the plaintiffs, nor could one reasonably be, that this statute deprives them of all economically viable use of their property. As a result, the defendants are entitled to summary judgment on this claim.

■ The regulatory action of the state in allowing the public to hunt animals which may inhabit the plaintiffs' landholdings for a period of time in no way precludes the plaintiffs from continuing to hunt on their property. The most that can be said is that their right to hunt the game on their property has been diminished. This is not the type of regulatory action that the Supreme Court's regulatory taking cases encompass. *E.g., Lucas,* —— U.S. at ——, 112 S.Ct. at 2889

(zoning laws rendering property valueless); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987) (requiring landowner to provide an easement); *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).[14] As such, this regulatory action does not constitute a taking under *Lucas* and its predecessors.[15]

### b. *Physical Takings Claims*

■ The plaintiffs' second takings challenge involves alleged physical invasions. The first claim is based on the animals' presence on the plaintiffs' land, and the second is based on the animals' consumption of the forage on the plaintiffs' land. It is apparent that the viability of these claims will necessarily turn on the answer to the question of who, if anyone, "owns" wild animals. For reasons expounded below, it is clear that no one "owns" wild animals, in the proprietary sense, when they are in their natural habitat unless and until the animals are reduced to something akin to possession.

This principle regarding ownership of wild animals is an ancient property doctrine dating back to the earliest days of the common law. The landmark decision in *Pierson v. Post,* 3 Cai.R. 175 (N.Y.Sup.Ct.1805), which is generally recognized as one of, if not the, earliest cases to address the issue of the ownership of wild animals ("*feræ naturæ*"), is particularly instructive.

Post, the plaintiff, had been hunting wild foxes on a beach with the aid of his hounds. Although Pierson, the defendant, knew that Post was chasing a particular fox, he killed the fox that Post had been chasing and claimed it as his own. The lower court concluded that Pierson was liable to Post for trespass. The question presented on appeal was whether Post, in pursuing the fox, "acquired such a right to, or property in, the fox, as will sustain an action against Pierson for killing him and taking him away?" *Id.* at 177. In the course of holding that Pierson's

---

**14.** Moreover, the plaintiffs' ability to use their property for ranching, farming and other livestock operations has not been affected by this regulation.

**15.** It should be pointed out that the state's regulatory scheme permits landowners to charge access and trespass fees for all hunters who use their land.

conduct was not actionable because Post did not have a property interest in the fox, the court stated the principle relevant to this case, which is that "property in [wild] animals is acquired by occupancy only." *Id.*

Over a century later, Justice Holmes acceded to the view that occupancy, or possession, was a necessary prerequisite to obtaining a property interest in animals *feræ naturæ.* He reaffirmed the basic premise of *Pierson* in the succinct but eloquent manner that typified his opinions, stating that "[w]ild birds are not in the possession of anyone; and possession is the beginning of ownership." *Missouri v. Holland,* 252 U.S. 416, 434, 40 S.Ct. 382, 384, 64 L.Ed. 641 (1920).

■ Thus, it is apparent that "[a]s a general rule, wild fish, birds and animals are owned by no one. Property rights in them are obtained by reducing them to possession." *United States v. Long Cove Seafood, Inc.,* 582 F.2d 159, 163 (2d Cir.1978). As a result, the plaintiffs cannot claim a property interest in these wild animals, which is essential to their takings claim.

Because wild animals are owned, in the proprietary sense, by no one, including the state, it follows *a fortiori* that there has been no physical invasion of the plaintiffs' property which is attributable to the state. This was the conclusion reached in *Moerman v. California,* 17 Cal.App.4th 452, 21 Cal. Rptr.2d 329 (1993).

In *Moerman,* the plaintiff alleged that the State of California had damaged his property by relocating tule elk which were destroying his fences and eating forage on his property that was intended for his livestock. The trial court granted the state's motion for summary judgment on the plaintiff's takings claims.

In the course of affirming this ruling, the appellate court stated "[w]e find the tule elk are not instrumentalities of the state nor controlled by the state, and, therefore, there has been no physical taking of Moerman's property." *Id.* at 329.

In addition, the court noted that under *Loretto,* a leading United States Supreme Court decision on physical takings, there must be a permanent physical invasion of the landowner's property before there can be a physical taking. The notion that the invasion must be permanent, said the court, simply has no application in the context of wild animals who roam about freely and who are anything but permanent fixtures. *Id.* at 331. Finally, the court noted that most of the courts that had considered the issue of whether the government owes compensation for a taking in the form of forage destruction had rejected such claims. *Id.*.(citations omitted); *see also Hodel,* 799 F.2d at 1428–29 (collecting cases).

For all of the aforementioned reasons, it is clear that the state cannot be held accountable for the animals' presence or any forage damage that they caused, and therefore, the plaintiffs' physical takings claims must fail.[16] In sum, therefore, the defendants are entitled to summary judgment with respect to all aspects of the plaintiffs' claims related to § 23–1–103.

### B. *Challenges to the Landowner Regulation*

■ The plaintiffs' second challenge is brought under the takings and equal protection clauses,[17] and alleges that § 3, the landowner regulation, which permits certain landowners to receive two additional hunting licenses per species of big game, so long as

---

16. The Court notes that by statute, the state allows landowners to submit a claim for compensation to the state for damage caused by certain wildlife. *See* Wyo.Stat. § 23–1–901 (1977).

17. Although plaintiffs' first amended complaint appeared to challenge the landowner regulation under the negative Commerce Clause, subsequent pleadings filed by the plaintiffs appear only to challenge the resident/non-resident licensing regulation, § 6, under the negative Commerce Clause and not the landowner regulation. *See* Plaintiffs' Brief in Response to Defendants' Motion for Summary Judgment, Nov. 9, 1993;

Plaintiffs' Response to the Intervenor–Defendants' Brief in Support of Summary Judgment, Dec. 30, 1993.

In any event, it is difficult to see what the "commerce" is that is affected by the landowner regulation. The regulation permits qualified landholders to apply for, and receive, additional hunting licenses. To the extent that the plaintiffs' seek to challenge this regulation under the negative Commerce Clause, their claim must fail because there has been no showing how "commerce" is implicated.

they meet certain criteria, is unconstitutional. Finding that these claims are also without merit, the defendants' motions for summary judgment must also be granted.

### 1. *Equal Protection Claim*

The plaintiffs assert that the landowner regulation denies them their right to equal protection of the laws. Their claim is that the fact that all landowners who satisfy the criteria for obtaining these licenses receive the same number of licenses, regardless of the size of their landholdings, violates equal protection. They further argue that the purpose of this regulation is to restrict landowners to a maximum of two licenses and that this restriction violates the equal protection clause.

The plaintiffs' first argument is that because this regulation affects a fundamental right (i.e., the right not to have one's property taken without just compensation), it must be subjected to strict scrutiny and the state has not carried its burden of showing a compelling state interest in order to justify it. In the alternative, the plaintiffs argue that this regulation is invalid even under rational basis review because this regulation is not rationally related to a "legitimate" state interest. Specifically, they contend that the state's purpose in enacting this regulation is not legitimate because it does not serve any game management purpose.

The defendants dispute these characterizations, arguing that this regulation does not affect a fundamental right because property rights are not considered fundamental rights for these purposes. In addition, they contend that this regulation passes muster under rational basis review.

### a. *Applicable Legal Principles*

It is a basic proposition that "when a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985). In deciding the appropriate level of "scrutiny" to be applied to particular legislative or regulatory actions, the Supreme Court has held that:

unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

*Nordlinger v. Hahn*, 505 U.S. ——, —— – ——, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992) (citations omitted); *Burlington Northern R.R. Co. v. Ford*, 504 U.S. ——, ——, 112 S.Ct. 2184, 2186, 119 L.Ed.2d 432 (1992) (citations omitted); *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *accord Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 322, 96 S.Ct. 2562, 2571, 49 L.Ed.2d 520 (1976) (*per curiam*) (stating that heightened equal protection scrutiny is only warranted if the classification is based on a suspect class or interferes with the exercise of a fundamental right). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude ... and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process." *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254; *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938); *see also Spragens v. Secretary of Health and Human Svces.*, 808 F.Supp. 1537, 1540 (D.Wyo.1992) (Brimmer, J.).

In situations where the Supreme Court has been concerned that the political process cannot be trusted to redress certain legislative actions, the Court has held that deferential review by the judiciary is inappropriate and some form of higher scrutiny is warranted. *See Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. When a legislative classification is based on an "inherently suspect" characteristic, the Court has found heightened review to be appropriate. *Id.* at 440–41, 105 S.Ct. at 3254–55. In addition, "[s]imilar oversight by the courts is due when state laws impinge on *personal rights* protected by the Constitution." *Id.* (emphasis added) (citations omitted).

#### b. *Application in this Case*

The plaintiffs argue that this statute infringes on a fundamental right, in the form of a property right, and that it must therefore be subjected to strict scrutiny. As noted above, however, this type of social regulation is presumptively subject to review only for rationality and thus, the plaintiffs bear the burden of demonstrating why some form of heightened review is appropriate. *See id.* at 440, 105 S.Ct. at 3254. The plaintiffs have not carried their burden in this case and therefore the Court finds that departure from the traditional rational basis review is inappropriate.

The plaintiffs' reliance on *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972) for the proposition that heightened review is warranted is misplaced. In *Lynch*, the Court, in the context of interpreting 28 U.S.C. § 1343(3), a jurisdictional statute, stated that the statute makes no distinction between "personal liberties and property rights." *Id.* at 552, 92 S.Ct. at 1122. The *Lynch* Court, however, was not interpreting the equal protection clause. While the personal liberties/property rights distinction may lack vitality in the statutory context presented by *Lynch*, a more recent and apposite precedent expressly states that heightened equal protection review is warranted only when state laws impinge on *"personal rights* protected by the Constitution." *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254 (emphasis added) (citations omitted). Thus, not only has the Supreme Court never held that an alleged takings violation is subject to heightened equal protection review, but *Cleburne* implicitly rejects this assertion. *Cf. United States v. 16.92 Acres of Land*, 670 F.2d 1369, 1373–74 (7th Cir.), *cert. denied sub nom. Brewer v. United States*, 459 U.S. 824, 103 S.Ct. 54, 74 L.Ed.2d 60 (1982) (providing that property rights are protected by the equal protection clause only to the extent that legislative classifications are not irrational) (citation omitted).

There is, moreover, at least one other valid reason for rejecting this argument. The right not to have one's property taken without just compensation, the property right at issue here, is very different from the type of personal right that has been recognized as "fundamental" for equal protection purposes. *See, e.g., Murgia*, 427 U.S. at 312 n. 3, 96 S.Ct. at 2566 n. 3 (citing cases which involve fundamental rights such as the right to vote, the right to procreate, and the right to interstate travel). All of those fundamental personal rights are rights that the individual can affirmatively exercise. It is clear that any "rights" conferred by the takings clause are different from these fundamental rights in that they are not affirmative rights that can be exercised. For all of these reasons, the Court finds that the plaintiffs have failed to rebut the presumption that rational basis review applies to social legislation and heightened scrutiny of this regulation is therefore unwarranted.[18]

Applying rational basis review to this regulation, this Court has no trouble concluding that this regulation is in fact constitutional. In reviewing the constitutionality of social and economic regulations such as the one in this case in the post-*Lochner*[19] era, the Supreme Court has stated that:

> the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. *A statutory discrimination will not be set aside if any set of facts reasonably may be conceived to justify it.*

*McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) (emphases added).

---

**18.** This analysis is not meant to degrade property rights or to say that they are not, in some sense, "fundamental." The point is, however, that property rights are not fundamental rights for purposes of deciding the appropriate level of constitutional scrutiny that must be given to state laws that may affect those rights.

**19.** *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

■ In the present case, it is certainly "conceivable" that this regulation was designed to benefit landowners and to reward them for allowing individuals to hunt on their land and for the forage eaten by these animals. Moreover, while the plaintiffs assert that the regulation does not serve any game management purposes, it is equally conceivable that in deciding the number of licenses to be issued in a given year, which necessarily must account for the number of landowner licenses, the Commission takes into account certain conservationist and game management policies. It bears repeating that this Court's review is limited to deciding whether it is "conceivable" that the statute serves legitimate state objectives. Because the granting of additional hunting licenses to landowners can at least arguably further conservationist and/or game management policies, the Court is compelled to reject the plaintiffs' equal protection claim.

■ The existing licensing scheme treats all landowners who meet the relevant criteria for receiving these additional licenses in an equal fashion. The plaintiffs' claim—that they should be entitled to additional licenses because they own more land—is in effect a request for *unequal* treatment.[20] While the state has elected to treat a certain category of landowners equally, certain members of that group are now asking for special treatment. Even if this Court believed that two licenses per landowner was somehow de minimis, this Court's perception of the wisdom of a particular legislative decision within the state's domain is irrelevant. The days when the federal courts sat as super-legislatures to second-guess the wisdom of state laws are long gone. This Court's role is not to try to discern the "true" purpose of this regulation; rather, the Court must simply assure that this regulation is rationally related to the furtherance of a legitimate state objective. Because the Court concludes that it is, the plaintiffs' equal protection claims must fail.[21]

### 2. Takings Claim

■ The plaintiffs' final challenge to the landowner regulation is that it constitutes a taking in violation of the Fifth Amendment. The alleged property right at issue is the plaintiffs' asserted right to hunt the animals on their land. The landowner regulation, however, which provides landowners with additional hunting licenses, does not effectuate any sort of a "taking" of a property interest that belongs to the plaintiffs. Therefore, this claim, like the takings challenges to § 23–1–103, must also fail.

### C. Challenge to the Non–Resident Licensing Regulation

The plaintiffs' final challenge is brought pursuant to the negative commerce clause[22]

---

20. This case does not present an equal protection claim by an individual who claims that he or she should be entitled to additional licenses even though he or she does not meet the regulatory criteria for receiving these licenses (i.e., the individual owns less than 160 contiguous acres). All of the landowners in this case meet the regulatory criteria.

21. Thus, even if the plaintiffs' claims that this regulation serves as a restriction, rather than a benefit, is taken as true, this does not create a "material" issue of fact because the appropriate inquiry is not what the regulation's actual purpose was but whether it could "conceivably" be a legitimate purpose. Here, it is certainly conceivable that this regulation was designed to benefit landowners.

22. The plaintiffs have not asserted a claim that this regulation violates the Privileges and Immunities Clause of the Constitution, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. CONST. art. IV, § 2, cl. 1.

The Supreme Court's decision in *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) may nonetheless foreclose such a claim.

In *Baldwin*, the Court considered the question of whether Montana's regulatory scheme of charging non-resident hunters higher licensing fees than those charged to resident hunters violated this clause. In rejecting this claim, the Court held that:

[s]ome distinctions between residents and non-residents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally.

*Id.* at 383, 98 S.Ct. at 1860. The Court ultimately concluded that "[e]quality in access to Montana elk is not basic to the maintenance or wellbring of the Union" and therefore the claims

and challenges the constitutionality of § 6 of the regulations, which allocates a certain percentage of the total number of hunting licenses for certain species of big game to non-residents. Paragraph five of that section of the regulation is at issue, and it provides that:

> 20 percent of deer, antelope, mountain lion and wild turkey licenses are reserved for nonresidents, and 16 percent of elk licenses are reserved for nonresidents.

Regulation XLIV, § 6, ¶ 5. Moreover, paragraph seven of the preceding regulation, § 5, is also relevant to this claim because it addresses the allocation of licenses to residents, and provides that the remaining licenses—80 percent of antelope, mountain lion and wild turkey licenses, along with 84 percent of elk licenses—are reserved for Wyoming residents.

The gravamen of the plaintiffs' claim[23] is that the regulatory discrimination in licensing between residents and non-residents violates the negative commerce clause. In the plaintiffs' own words:

> [i]t is at the licensing stage that the State is interfering with interstate commerce by discriminating against non-residents.... These restrictions [on the number of licenses available to non-residents] ... restrict Plaintiffs' ability to service non-residents because it limits the number of non-residents to whom they can market their services. The restrictions on their ability to service non-residents violates Plaintiffs' rights ... under the commerce clause.

Plaintiffs' Brief in Support of Cross–Motion for Partial Summary Judgment, Nov. 12, 1993 at 7. Thus, the allegations are that the regulatory discrimination against non-residents limits the plaintiffs' ability to sell hunting services that they offer, including guides, food and lodging, to non-resident hunters.

Finally, the plaintiffs contend that this regulation has its genesis in the defendants' desire to curry political favor with particular constituencies within the state, and that in order to gain support for their programs, it is necessary to "reward" these in-state constituencies by giving them the majority of the licenses.

### 1. Negative Commerce Clause

In order to analyze properly the plaintiffs' claims, it is necessary to understand the theoretical basis for the Supreme Court's negative commerce clause jurisprudence.

### a. Theoretical Underpinnings

As noted above, although the commerce clause enshrined in Article I of the Constitution is phrased in terms of an affirmative grant of power to Congress, it is well-established that "the Clause also embodies a negative command forbidding the States [from] discriminat[ing] against interstate trade." *Associated Indus. of Missouri v. Lohman,* —— U.S. ——, ——, 114 S.Ct. 1815, 1820, 128 L.Ed.2d 639 (1994) (citing, *inter alia, New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988)).

The Supreme Court has given meaning and effect to "these great silences of the Constitution"[24] which embody the "cardinal rule of nondiscrimination[,]" *see Lohman,* —— U.S. at ——, 114 S.Ct. at 1820, by recognition of the need to "avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes,* 441 U.S. at 325–26, 99 S.Ct. at 1731 (citation omitted). Stated alternatively, this rule of non-discrimination

---

asserted "simply [did] not fall within the purview" of this clause because "elk hunting by nonresidents in Montana" was not deemed to be a "fundamental" privilege or immunity. *Id.* at 388, 98 S.Ct. at 1862; *cf. Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 279–82, 105 S.Ct. 1272, 1275–77, 84 L.Ed.2d 205 (1985) (noting that the Privileges and Immunities Clause only applies to those privileges and immunities which are "fundamental").

The import of these cases would seem to undercut the viability of a Privileges and Immuni-

ties Clause challenge to §§ 5 and 6 of the regulations in this case since hunting wild animals would most likely not constitute a fundamental privilege or immunity.

**23.** The plaintiffs' motion for partial summary judgment on this claim was joined in by Lincoln County Outfitters Association who filed a brief as *amicus curiae.*

**24.** *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949).

858

is grounded in the understanding that "our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy ... has as its corollary that the states are not separable economic units." *Du Mond,* 336 U.S. at 537–38, 69 S.Ct. at 665.

■■■■ The Supreme Court has stated that the political process provides adequate protection against overly burdensome regulations that affect both in-state and out-of-state interests. As a result, the negative commerce clause's function is to protect out-of-state interests from the "evil[s] of protectionism"[25] that are embodied in regulatory measures that seek to benefit in-state interests at the expense of out-of-state interests. Thus, when the regulatory action of state A burdens businesses in both state A and state B, the Supreme Court has stated that heightened judicial intervention is ordinarily inappropriate because the political constituencies within state A and the political process itself will limit the potential for abuse precisely because state A's interests have been affected. So long as the regulation does not place an excessive burden on interstate commerce, it will be upheld. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In contrast, however:

> when the regulation is of such a character that its burden falls principally upon those [outside] the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation [which also affects in-state interests].

*South Carolina State Highway Dep't v. Barnwell Bros.,* 303 U.S. 177, 184 n. 2, 58

S.Ct. 510, 513 n. 2, 82 L.Ed. 734 (1938). Under those circumstances, the Court is less confident in trusting the political process to curb the potential for abuse because the out-of-state interests which have been adversely affected have no political recourse within the state that enacted the regulation.[26] Moreover, the in-state interests cannot be counted on to curb this action because the regulation obviously inures to their benefit. In those cases, therefore, heightened judicial review of state economic regulation is necessary in order to compensate for the failure of the political process.[27]

### b. *The Governing Legal Framework*

■■■ "Th[e] 'negative' aspect of the commerce clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Wyoming,* 502 U.S. at ——, 112 S.Ct. at 800; *see also Fort Gratiot Landfill v. Michigan Dep't of Natural Resources,* —— U.S. ——, ——, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992); *Chemical Waste Mgmt., Inc. v. Hunt,* —— U.S. ——, —— – ——, 112 S.Ct. 2009, 2012–13, 119 L.Ed.2d 121 (1992). The negative component of the commerce clause serves to limit the power of the states to enact statutes or regulations that either unjustifiably discriminate or excessively burden the free flow of interstate commerce. *See Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2024; *Hunt,* —— U.S. at —— – ——, 112 S.Ct. at 2013–14; *Wyoming,* 502 U.S. at ——, 112 S.Ct. at 800; *Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736.

In recognition of the fact that facially discriminatory regulations are more pernicious to the policies embodied in the negative com-

25. *New Jersey,* 437 U.S. at 626, 98 S.Ct. at 2536.

26. The paradigm example of so-called protectionist legislation which the Supreme Court has repeatedly condemned is state regulatory measures which are designed to discourage neighboring states from dumping their garbage within another state by imposing surcharges on garbage produced out-of-state but not garbage generated in-state. The Supreme Court has repeatedly struck down this type of "parochial legislation" as precisely the type of protectionist legislation that the negative Commerce Clause was designed to prevent. *See New Jersey,* 437 U.S. at 626, 98 S.Ct. at 2536.

27. This rationale is similar to the Supreme Court's rationale discussed above in the equal protection context, which share the common attribute of judicial restraint; that is, the notion that heightened judicial intervention is only warranted when the normal democratic processes cannot be trusted as a valid check on legislative abuses of power. When the political process remains intact, however, judicial review is limited to review for rationality in the equal protection context, *see Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254, or review for reasonableness in the negative Commerce Clause context, *see Pike,* 397 U.S. at 142, 90 S.Ct. at 847.

merce clause than non-discriminatory regulations that burden interstate commerce only incidentally, the Court has stated that:

> the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or [whether it] discriminates against interstate commerce.

*Oregon Waste Systems v. Department of Environmental Quality*, —— U.S. ——, ——, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) (citations and internal quotations omitted).[28] In making the threshold determination of whether the regulation is facially discriminatory *vel non*, "the degree of a differential burden or charge on interstate commerce 'measures only the *extent* of discrimination' and 'is of *no relevance* to the determination whether a State has discriminated against interstate commerce.'" *Oregon Waste Systems*, —— U.S. at —— n. 4, 114 S.Ct. at 1350 n. 4 (quoting *Wyoming*, 502 U.S. at ——, 112 S.Ct. at 796) (first emphasis in original; second emphasis added).

 If a regulation is in fact facially discriminatory,[29] "either on its face or in practical effect," *Wyoming*, 502 U.S. at —— – ——, 112 S.Ct. at 800–01; *Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736, then the regulation must be subjected to the "strictest scrutiny." *Hughes*, 441 U.S. at 337, 99 S.Ct. at 1737; *Dorrance v. McCarthy*, 957 F.2d 761, 763 (10th Cir.1992). In effect, facially

discriminatory regulations are presumed to be nothing more than the type of protectionist legislation which the negative radiations of the commerce clause condemn. As a result, they will be struck down unless the state can carry its burden of showing that "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming*, 502 U.S. at ——, 112 S.Ct. at 800, *quoted in Hunt*, —— U.S. at ——, 112 S.Ct. at 2015. The state's burden requires it to demonstrate that the ends served by the regulation promote a legitimate (i.e., non-protectionist) local interest which cannot be furthered by any alternative, non-discriminatory means. *See Wyoming*, 502 U.S. at ——, 112 S.Ct. at 800 (citing *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)); *Hunt*, —— U.S. at ——, 112 S.Ct. at 2014; *accord Dorrance*, 957 F.2d at 763. However, "[t]he state's burden of justification is so heavy that facial discrimination by itself may be a fatal defect." *Oregon Waste Systems*, —— U.S. at ——, 114 S.Ct. at 1351 (citing cases) (internal quotations omitted).[30] The Court has often stated that facially discriminatory regulations are subject to a "virtually *per se* rule of invalidity." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978); *accord Lohman*, —— U.S. at ——, 114 S.Ct. at 1820; *Oregon Waste Systems*, —— U.S. at ——, 114 S.Ct. at 1350.

---

**28.** This recent negative Commerce Clause case was decided after the hearing in this matter. The plaintiffs cited the case to the Court in an April 6, 1994 document entitled "Notice of Recent Relevant Ruling." The defendants objected to the plaintiffs' reliance on this decision.

The Court has considered the defendants' objections thereto and has concluded the *Oregon Waste Systems* decision, along with the *Lohman* decision, are instructive as to the existing law in this area. They are not relied upon by the Court for their persuasive value based on any alleged similarity between the particular facts of that case to the facts of the case at bar.

**29.** "As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems*, —— U.S. at ——, 114 S.Ct. at 1350.

**30.** *Taylor* is the only case to date that this Court has found where the Supreme Court upheld a facially discriminatory regulation under the negative Commerce Clause.

In *Taylor*, the State of Maine enacted a law prohibiting the importation of live baitfish from waters outside of Maine. The Court accepted the state's defense of the law on the grounds that baitfish from other waters contained parasites that were not present in Maine's waters and that these parasites would import diseases to Maine's waters. In addition, the Court agreed with the state that there were no alternative means for inspecting baitfish shipments to screen them for potential parasite problems. *See Taylor*, 477 U.S. at 140–151, 106 S.Ct. at 2448–2454. As a result, the Court found that although the regulation was facially discriminatory, the state had nonetheless carried its burden of justification.

If, however, the regulation is non-discriminatory, if it regulates evenhandedly without regard to the place that the commerce originated,[31] and if its effects on interstate commerce are only incidental, then it is presumptively valid and will be upheld unless the party who challenges the regulation, *see Dorrance,* 957 F.2d at 763, can demonstrate that the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847, *quoted in Oregon Waste Systems,* —— U.S. at ——, 114 S.Ct. at 1350; *Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2024; *Wyoming,* 502 U.S. at —— n. 12, 112 S.Ct. at 800 n. 12.

### c. Application to the Case at Bar

#### i. Is the Regulation Discriminatory?

The first step in analyzing this claim is to decide whether these regulations are discriminatory either on their face or in their practical effect. *See Oregon Waste Systems,* —— U.S. at ——, 114 S.Ct. at 1350 (citations omitted). This, in turn, determines the appropriate level of scrutiny to be applied to this regulation.[32]

The plaintiffs allege that "[t]he Wyoming regulations on their face discriminate against interstate commerce." They contend that the discrimination embodied in this regulation has decreased their ability to sell their services to non-resident hunters in violation of the negative commerce clause. As a result, the plaintiffs assert that heightened scrutiny is appropriate.

This argument, however, rests on the unsupported assumption that non-resident hunters are more likely to purchase the plaintiffs' services than resident hunters, an assumption that may or may not be valid, but which is unsupported by any evidence in the record before the Court.

The intervenor-defendants, however, argue that while this regulation does "discriminate," the discrimination is not against commerce, but rather is against non-residents. In short, they argue that the plaintiffs have erroneously equated discrimination against non-residents with discrimination against commerce, and that in fact, this regulation in no way creates any barriers to the free flow of commerce. Finally, they argue that the essence of the plaintiffs' complaint is that this Wyoming regulation harms Wyoming interests, that these claims can be addressed in the political process without the need for any heightened judicial scrutiny and that the regulation is valid under *Pike.*

■ After careful examination of this issue, the Court concludes that the resident license preference regulation is not a facially discriminatory enactment. Although it may very well be true that these regulations indirectly place an incidental burden on commerce,[33] they do not discriminate against commerce. The regulations simply do not, on their face or in effect, establish any barriers to the plaintiffs' ability to sell their services and the corollary goods (hunting supplies, food and the like) to non-residents.

■ The plaintiffs' claim erroneously equates residency discrimination with discrimination against commerce. While there is clearly some overlap between the Privileges and Immunities Clause and the negative commerce clause, they are distinct constitutional provisions, the reaches of which are not co-extensive. The most obvious area of incongruence between these clauses is in the fact that the commerce clause requires a nexus to commerce before it applies, whereas

---

**31.** Regulations that discriminate on their face against foreign articles of commerce may only be justified by showing that "there is some reason, *apart from their origin,* to treat [the articles of commerce] differently." *Hunt,* —— U.S. at ——, 112 S.Ct. at 2015 (citations omitted).

**32.** It is clear that the services that the plaintiffs offer and which they allege were adversely affected by this regulation constitute "commercial transactions" which qualify as "articles of commerce." *See Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2023 (commercial transactions have an interstate character). Moreover, there is no reason to assume that the services at issue in this case are any less "articles of commerce" than the goods at issue in other cases. *See, e.g., Oregon Waste Systems,* —— U.S. at ——, 114 S.Ct. at 1348 (waste); *Hunt,* —— U.S. at ——, 112 S.Ct. at 2011 (hazardous waste); *Wyoming,* —— U.S. at ————, 112 S.Ct. at 797–99 (coal).

**33.** Taken to its extreme, it is hard to imagine any regulation that does not, to some extent, affect commerce. *Cf. Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

the Privileges and Immunities Clause has no such limitation.

*Oregon Waste Systems* makes it clear that a regulation may only be classified as discriminatory if there is "differential treatment of in-state and out-of-state economic interests *that benefits the former and burdens the latter."* —— U.S. at ——, 114 S.Ct. at 1350 (emphases added). In the case at bar, however, the plaintiffs are really complaining about the fact that a Wyoming regulation burdens Wyoming interests by reducing the plaintiffs' ability to sell their services to non-residents, whom they contend are more likely to purchase their services. This type of regulatory action does not warrant heightened judicial review under the negative commerce clause because the political arena provides an adequate check against this type of action. If these Wyoming businesses do not agree with this preferential allocation of licenses because they claim that it reduces their ability to provide services to non-residents, they may seek vindication of their views by way of the political process. *Barnwell* makes it clear that in circumstances where the citizens of one state are dissatisfied with regulatory action *enacted by their own elected representatives,* the role of the judiciary is limited and the primary avenue of redress is in the democratic process. Thus, even if the plaintiffs are correct that these regulations were motivated by political interests, an issue on which this Court need not opine, the point is that the Supreme Court has clearly stated that the more appropriate venue for redressing these grievances is the political forum, and not the unelected, and more importantly, unaccountable, judicial forum.

■ The conclusion that this regulation is not facially discriminatory does not, however, end the Court's analysis. Such a finding does not automatically validate the regulation under the negative commerce clause. In order to assess the constitutionality of this regulation, the Court must determine whether the incidental effect on commerce created by this regulation is reasonable in relation to the local benefits.

ii. *The* Pike *Balancing Test*

■ Regulations that are evenhanded and which produce only incidental effects on interstate commerce are subject to less scrutinizing judicial review under the so-called *"Pike"* balancing test. Under this test, the burden is on the plaintiffs to demonstrate that the incidental effects on interstate commerce outweigh the local benefits. *See Pike,* 397 U.S. at 142, 90 S.Ct. at 847; *Dorrance,* 957 F.2d at 763 ("The person challenging a statute that regulates evenhandedly bears the burden of showing that the incidental burden on interstate commerce is excessive compared to the local interest.").

This balancing requires this Court to consider, *inter alia,* the relative burden on commerce vis-à-vis the local interests that are advanced by the regulation, and whether these local interests could be advanced by less burdensome alternative means. *See, e.g., id.* 397 U.S. at 142, 90 S.Ct. at 847, *quoted in Dorrance,* 957 F.2d at 764–65. In assessing the validity of this type of regulation, the Court notes that such decisions are "peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection." *Baldwin,* 436 U.S. at 391, 98 S.Ct. at 1864 (citation omitted).

■ In *Dorrance,* the Tenth Circuit reversed an order granting summary judgment for the defendants on a similar claim. The court stated that the district court's findings established that there were genuine issues of fact as to whether the burdens of commerce were "clearly excessive" in relation to the local benefits, and that as a result, summary judgment was improper. Although *Dorrance* obviously counsels hesitation in granting a motion for summary judgment on this type of claim, it does not alter the fact that summary judgment is appropriate if there is "no genuine issue of material fact" and the moving party is entitled to "judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). In the present case, the Court is of the opinion that the plaintiffs have failed to carry their burden of creating a genuine issue of fact regarding whether this regulation burdens commerce in

a clearly excessive manner as a matter of law.[34]

The plaintiffs' argument necessarily hinges on their assumption that this regulation burdens their ability to provide their services to non-resident hunters (i.e., the alleged commerce at issue) and that non-residents are more likely to utilize their services than residents. As noted above, however, the record is devoid of any evidence that would tend to support these assumptions. Such evidence, moreover, is obviously critical to this analysis because without it, the plaintiffs cannot show that these alleged burdens on commerce are "clearly excessive" in relation to the local benefits. *Cf. Dorrance,* 957 F.2d at 765 ("*Because Plaintiff presented evidence* that created genuine issues of material fact as to whether the [regulation's] burden on interstate commerce was 'clearly excessive in relation to the putative local benefits,' ... the district court erred in entering summary judgment [for the defendants].") (emphasis added).

Furthermore, while the Court is mindful of the need to inquire into whether there are any alternative means that exist to accomplish the state's purposes "with less impact on interstate commerce[,]" *id.* at 764, this analysis cannot meaningfully take place until the impact on interstate commerce is first ascertained through credible evidence offered by the plaintiffs. In other words, the inquiry into the existence of less burdensome alternatives presupposes that there has been a showing as to the nature and extent of the alleged burden.

In this case, the most that can be said is that this licensing regulation may indirectly and secondarily affect interstate commerce in the form of the plaintiffs' ability to sell their services. There has, however, been no showing that non-residents are more likely to use their services as opposed to residents. Because this Court cannot intelligently quantify the nature of any burden on interstate commerce based on a deficiency of proof relative to that issue, it is clear that the plaintiffs in this case, unlike the plaintiff in *Dorrance,* have failed to carry their burden on demonstrating that this regulation is "clearly excessive" in relation to the local benefits as a matter of law. As a result, the defendants are entitled to summary judgment on this claim.

**THEREFORE,** it is

**ORDERED** that the Defendants' Motions for Summary Judgment be, and the same hereby are, **GRANTED.** It is further

**ORDERED** that the Plaintiffs' Cross–Motion for Partial Summary Judgment be, and the same hereby is, **DENIED.**

Dated this 8th day of June, 1994.

---

34. The plaintiffs' only argument under the negative commerce clause regarding this regulation was that it was facially discriminatory and that the state failed to carry its burden of justification.

The Court has already concluded that this regulation is not facially discriminatory. Because the plaintiffs did not argue in the alternative that this regulation was invalid under *Pike,* it stands to follow that the plaintiffs have not addressed whether there are factual issues regarding the nature and extent of the burden that this regulation allegedly poses on commerce and whether that burden was clearly excessive in relation to the local benefits that resulted from the regulation.