# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00703-CV

**Ken Bailey and Bradley Peterson, Appellants**

**v.**

**Carter Smith, Executive Director; Clayton Wolf, Wildlife Division Director; Mitch Lockwood, Big Game Program Director; and Texas Parks & Wildlife Department, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. D-1-GN-15-004391, HONORABLE TIM SULAK, JUDGE PRESIDING

## CONCURRING AND DISSENTING OPINION

On this record, I agree with the Court's conclusion that the trial court properly dismissed for lack of jurisdiction Peterson's declaratory judgment and ultra vires claims. I disagree, however, with the Court's conclusion that the trial court correctly granted summary judgment on Peterson's due process claims concerning the Texas Parks and Wildlife Code (the Code) and the Department's rules, *see* 31 Tex. Admin. Code §§ 65.90–.99 (Tex. Parks & Wildlife Dep't, Chronic Wasting Disease—Movement of Deer) (the CWD Rules). Specifically, I disagree with the analysis regarding whether Peterson has a property interest in his breeder deer and the conclusion that the Code does not "allow[] common law property rights to arise in breeder deer." *Ante* at ___. Our common law tradition—stemming from early English common law and with roots in Roman law—provides that individuals, through the sweat of their brow, may acquire ownership and property

rights in wild animals by legally removing them from their natural liberty and making them subject to man's dominion. *See, e.g.*, *State v. Bartee*, 894 S.W.2d 34, 41–42 (Tex. App.—San Antonio 1994, no pet.) (describing legal tradition and collecting case authorities). Because the Code does not take away this common law property right, I respectfully dissent.[1]

The Texas Supreme Court has long noted that the preservation of property rights is "one of the most important purposes"—in fact, "[t]he great and chief end"—of government. *Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 204 (Tex. 2012) (quoting *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977) and John Locke, Second Treatise of Government Chap. IX, Sec. 124 (C.B. McPherson ed., Hackett Publishing Co. 1980) (1690)). Private property rights "are, in short, a foundational liberty, not a contingent privilege." *Id.* at 204 n.34; *see* Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."). But the decision issued today fails to preserve and protect the fundamental property rights of the deer breeders in their captive-bred white-tailed deer.

I recognize that chronic wasting disease (CWD) poses a significant threat to the deer population and for the people of this state. As shown by both the Department's brief and the amicus brief of various wildlife and hunting associations,[2] CWD has potential negative impacts for Texas

---

[1] Although the Code regulates the possession of wild animals removed from their natural liberty and restricts the means by which ownership may be acquired by specifying the conditions of what may constitute legal captivity, I do not see this as contrary to ownership under the common law.

[2] These include: Texas Wildlife Association, Boone and Crockett Club, Texas Chapter of the Wildlife Society, Association of Fish and Wildlife Agencies, The National Wildlife Federation, National Wild Turkey Federation, Texas Chapter of the Coastal Conservation Association, Backcountry Hunters & Anglers, and Texas and Southwestern Cattle Raisers Association.

wildlife, for the rich Texas tradition of hunting deer, and for the properties, businesses, and Texas fisc that derive value and revenue from licensing, leasing hunting rights, and supporting the hunting industry. However, measures to address that threat, while worthy, must be consistent with the rule of law. The legislature, as a representative body of the people, has the power to pass laws further restricting the captivity of breeder deer, implementing stricter regulations for deer breeder permits, and creating additional protections against CWD, insofar as they are consistent with our Constitution. And the Department may act within its delegated scope of authority as granted by the legislature. But I cannot agree that the threat of CWD justifies the deprivation of fundamental private property rights without due process contrary to our Constitution and the rule of law.

Because Peterson has a constitutionally protected property interest in his breeder deer, I continue where the Court left off and proceed to the merits of the district court's summary judgment order on Peterson's procedural due process claims. Both parties moved for summary judgment, but neither party met its burden to establish that it was entitled to summary judgment as a matter of law. I would therefore affirm the trial court's denial of Peterson's motion for summary judgment, but reverse the grant of the Department's summary judgment motion. Finally, the Court also affirmed the district court's $425,862.50 attorney's fee award against Peterson and the deer breeder Ken Bailey, who originally brought suit with Peterson but later nonsuited his claims. But because the attorney's fee award was based on, at least in part, the Department's summary judgment success, I would reverse and remand the attorney's fee award.

3

## I. STANDARD OF REVIEW AND LAW ON DUE PROCESS

We review a trial court's summary judgment de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 259 (Tex. 2018) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003)). A traditional movant for summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* (citing Tex. R. Civ. P. 166a(c); *Provident Life*, 128 S.W.3d at 215–16). When both parties move for summary judgment on the same issues, as they did here, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Id.* (citing *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex. 2000)). When the trial court grants one of the motions but denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented, and if we determine that the trial court erred, render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (citing *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000)). When the trial court does not specify the grounds for granting the summary judgment motion, we must uphold the judgment if any of the grounds asserted in the motion and preserved for appellate review are meritorious. *Provident Life*, 128 S.W.3d at 216.

Here, the summary judgment order granted the Department's motion and denied Peterson's motion, which centered upon Peterson's procedural due process claims against the Department. Due process rights are provided by both the United States Constitution and the Texas Constitution. *See* U.S. Const. amend. XIV, § 1; Tex. Const. art. I, § 19. Because the two clauses are nearly identical, Texas courts "have traditionally followed contemporary federal due process

4

interpretations of procedural due process issues." *Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) (quoting *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)). Before procedural due process rights attach, however, there must be a liberty or property interest that is entitled to constitutional protection. *Id.* (citing *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015)).

## II.  DISCUSSION

In a due process claim, we apply a two-part analysis:  (1) we determine whether Peterson has a property interest that is entitled to procedural due process protection; and (2) if so, we determine what process is due. *See id.*

### A.  Does Peterson have a property interest in his breeder deer?

"Property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" *Honors Acad.*, 555 S.W.3d at 61 (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). A constitutionally protected property interest must be based on a "'legitimate claim of entitlement' rather than a mere 'unilateral expectation.'" *Id.* (quoting *Roth*, 408 U.S. at 577).

In Texas, "[a]ll wild animals, fur-bearing animals, wild birds, and wild fowl inside the borders of this state are the property of the people of this state."[3] Tex. Parks & Wild. Code

---

[3] The Texas legislature enacted the original predecessor to this statute in 1907, providing that "All the wild deer . . . and all other wild animals, wild birds and wild fowls found within the borders of this State, shall be and the same are hereby declared to be the property of the public." Act of April 19, 1907, 30th Leg., R.S., ch. 144, § 1, 1907 Tex. Gen. Laws 278, 278 (current version at Tex. Parks & Wild. Code § 1.011(a)).

§ 1.011(a); *see also Nicholson v. Smith*, 986 S.W.2d 54, 60 (Tex. App.—San Antonio 1999, no pet.) ("Meaning 'animals of a wild nature or disposition,' *ferae naturae* is a common law doctrine tracing its origins back to the Roman empire whereby wild animals are presumed to be owned by no one specifically but by the people generally. Specifically *ferae naturae* provides that wild animals belong to the state[.]" (citing *Bartee*, 894 S.W.2d at 41)). Thus, "no individual property rights [in wild animals] exist as long as the animal remains wild, unconfined, and undomesticated." *Hollywood Park Humane Soc'y v. Town of Hollywood Park*, 261 S.W.3d 135, 140 (Tex. App.—San Antonio 2008, no pet.).

Under Texas common law, however, "property rights in wild animals can arise when an animal is legally removed from its 'natural liberty' and subjected to 'man's dominion.'"[4] *Id.* (quoting *Nicholson*, 986 S.W.2d at 60); *see Jones v. State*, 45 S.W.2d 612, 614 (Tex. Crim. App. 1931) ("As a general rule, there is no individual property in wild animals or fish so long as they remain wild, unconfined, and in a state of nature, but wild animals become property when removed from their natural liberty and made subjects of man's dominion."); *Coastal Habitat All. v. Public Util. Comm'n*, 294 S.W.3d 276, 287 (Tex. App.—Austin 2009, no pet.) (stating converse proposition that "under state law, no vested property interest exists in wild animals" because "wild animals[] belong to the State, and no individual property rights exist in them as long as they remain wild, unconfined, and undomesticated"); *Bartee*, 894 S.W.2d at 41 ("Unqualified property rights in wild

---

[4] As the Court notes, "Texas adopted the common law of England as its rule of decision," which holds that "[p]rivate individuals could 'reduce a part of this common property [in wild animals] to possession, and thus acquire a qualified ownership in it,' but that right was subject to government regulation." *Ante* at ___ (quoting *Geer v. Connecticut*, 161 U.S. 519, 526 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322 (1979)).

animals can arise when they are legally removed from their natural liberty and made the subject of man's dominion."); *Wiley v. Baker*, 597 S.W.2d 3, 5 (Tex. App.—Tyler 1980, no writ) ("Unqualified property rights in wild animals can arise when removed from their natural liberty and made subjects of man's dominion."); *Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 875–76 (Tex. App.—Dallas 1962, writ ref'd n.r.e.) ("From the beginning, wild animals have been regarded as quasi property of the entire human race. . . . [E]xclusive property in birds and wild animals becomes vested in the person capturing or reducing them to possession. But unless killed, this is a qualified property, for when restored to their natural wild and free state, the dominion and individual proprietorship of any person over them is at an end and they resume their status as common property." (quoting *Hammonds v. Central Ky. Nat. Gas Co.*, 75 S.W.2d 204, 206 (Ky. 1934), *overruled on other grounds by Texas Am. Energy Corp. v. Citizens Fid. Bank & Tr. Co.*, 736 S.W.2d 25 (Ky. 1987)); *see also Hollywood Park Humane Soc'y v. Town of Hollywood Park*, No. Civ.A.SA03CA1312-XR, 2004 WL 390807, at *5 (W.D. Tex. Jan. 23, 2004) ("However, it is legally possible for an individual to have qualified property rights in a wild animal. . . . These property rights are often referred to as qualified, however, because they are lost if the animal regains its liberty." (applying Texas common law)).

The Court nevertheless determines that the Code does not "allow[] common law property rights to arise in breeder deer." *Ante* at ___. For this proposition, the Court relies primarily on two statutory provisions. First, the legislature has mandated that "[n]o person may capture, transport, or transplant any game animal or game bird from the wild in this state unless that person has obtained a permit to trap, transport, and transplant from the department." Tex. Parks & Wild.

7

Code § 43.061(a); *see id.* § 63.002 ("No person may possess a live game animal in this state for any purpose not authorized by this code."). Second, the legislature, in 1997, added a provision making clear that erecting a high fence does not affect wild animals' "status . . . as property of the people of this state." *See* Act of May 31, 1997, 75th Leg., R.S., ch. 1256, § 123, 1997 Tex. Gen. Laws 4732, 4757 (codified at Tex. Parks & Wild. Code § 1.013). And the Department goes further than the Court, proposing a theory of absolute state ownership of wildlife and arguing that "no individual may own wildlife" and "deer are not amenable to private ownership" because the legislature, in 1991, defined "wild" in terms of "species, including each individual of a species."[5] *See* Act of May 24, 1991, 72d Leg., R.S., ch. 424, § 1, 1991 Tex. Gen. Laws 1587, 1587 (codified at Tex. Parks & Wild. Code § 1.101(4)). As explained below, however, the statutory provisions the Court relies on do not prevent a deer breeder who holds a permit from acquiring ownership of breeder deer through legal captivity under the common law, and the Department is incorrect that the common law rule of ownership is now "obsolete" because "the Code defines 'wild' in terms of a species'[s] characteristics, not an individual animal's freedom."

### 1. The Court's analysis

As already noted, the common law rule is that an individual acquires ownership and property rights in a wild animal when it is "removed from its 'natural liberty'"—i.e., through legal capture or some other legal means—"and subjected to 'man's dominion.'" *Hollywood Park*,

---

[5] The Court does not address the Department's argument that relies on the statutory definition of "wild," instead stating that the Court's "narrower analysis [] is sufficient to dispose of Peterson's appeal." *Ante* at ____ n.10.

8

261 S.W.3d at 140 (quoting *Nicholson*, 986 S.W.2d at 60). Additionally, the Code expressly authorizes the removal of a breeder deer from its natural liberty—"breeder deer may be held in captivity for propagation in this state"—when "a deer breeder's permit is issued by the department." Tex. Parks & Wild. Code § 43.364.

The Court, however, argues that the Code "is clear that deer breeders have no vested property interest in their breeder deer" and does not allow "common law property rights to arise in breeder deer." *Ante* at ___. I disagree because the Code does not "clearly" express legislative intent to abrogate the common law principle providing property rights to deer breeders who legally remove breeder deer from their natural liberty and subject them to man's dominion, as I explain more fully below. *See Dealers Elec. Supply Co. v. Scroggins Constr. Co.*, 292 S.W.3d 650, 660 (Tex. 2009) ("But abrogation of common-law rights is disfavored, and absent clear legislative intent we have declined to construe statutes to deprive citizens of common-law rights."); *Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex. 2007) ("[S]tatutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended."); *Cash Am. Intern. Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) ("A statute that deprives a person of a common-law right 'will not be extended beyond its plain meaning or applied to cases not clearly within its purview.' . . . We have consistently declined to construe statutes to deprive citizens of common-law rights unless the Legislature clearly expressed that intent." (quoting *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969))).

Moreover, the Court's analysis does not take into account the temporal nature of legislative enactments when it "constru[es] all the[] provisions together against the backdrop of

9

[s]ection 1.011 and the common law" to conclude that "breeder deer are public property" and "deer breeders do not acquire common law property rights in them." *See ante* at ___ (citing *Marino v. Lenoir*, 526 S.W.3d 403, 409 (Tex. 2017)). If the legislature abrogated the common law, the abrogation must have occurred at a specific time by a specific statutory enactment. At issue then is when did the legislature intend to abrogate established common law principles and with what statutory provisions did it clearly express and effectuate that intent. The Court, however, melds statutory provisions that were enacted at different times without identifying which specific provision the legislature enacted at a specific time to clearly express and effectuate its intent to abrogate the common law principle providing for private ownership of breeder deer through legal captivity. *See ante* at ___ (citing Tex. Parks & Wild. Code §§ 1.011(a), 1.013, 43.061(a), 43.351(1), 43.357(a), 43.364, 43.366, 63.001(a), 63.002). Thus, for example, it is unclear if the Court considers the prohibitions on possession of breeder deer, *see* Tex. Parks & Wild. Code §§ 43.061(a), 63.002, as abrogating the common law before the legislature's 1997 enactment that fences do not affect the property status of the deer, *see id.* § 1.013, or if it was only with the culminating 1997 enactment regarding fences that the common law was abrogated construed in light of the earlier statutory prohibitions on possession.[6] *See ante* at ___. If the former, then the 1997 enactment as to the fences

---

[6] For similar reasons, I also find the Court's discussion of the public trust doctrine and the 1907 statutory enactment of section 1.011 codifying the public trust doctrine as largely irrelevant to the question of whether the legislature abrogated common law principles. *See ante* at ___. The Court does not appear to be arguing that the 1907 enactment of section 1.011 clearly expressed the legislature's intent to abrogate the common law, and subsequent case law demonstrates this point, as I describe above. Thus, the proper question is not whether the Court "should not interpret [s]ection 1.011 as codifying the public trust doctrine because the United States Supreme Court allegedly rejected that doctrine as a '19th-century legal fiction,'" *see ante* at ___, but whether section 1.011, or another later enacted statute, clearly expressed the legislature's intent to abrogate

10

would play no part in the analysis of whether the legislature abrogated the common law with the earlier enacted statutes. If the latter, then it is the 1997 enactment that must clearly demonstrate the legislature's intent to abrogate the common law. But, as I explain below, no statutory provision in the Code reflects the legislature's intent to abrogate the common law as to the private ownership of breeder deer and thus at no specific time did the legislature effectuate such an intent through a legislative enactment.

The Code expressly provides that "the holder of a valid deer breeder's permit" may (1) "engage in the business of breeding deer in the immediate locality for which the permit was issued;" and (2) "sell, transfer to another person, or hold in captivity live breeder deer for the purpose of propagation or sale." Tex. Parks & Wild. Code § 43.357(a); *see also id.* § 43.364. And the Code does not prohibit ownership acquired pursuant to common law principles. *See id.* § 43.364 ("All breeder deer and increase from breeder deer are under the full force of the laws of this state pertaining to deer."); *see also id.* § 43.366 ("[B]reeder deer held under a deer breeder's permit are subject to all laws and regulations of this state pertaining to deer except as *specifically* provided in this subchapter." (emphasis added)). That breeder deer must be "legally held under a permit," *id.* § 43.351(1), which regulates the possession and use of the breeder deer, does not deprive the deer breeder of its common law property interest in the breeder deer through legal captivity and dominion. *See, e.g.*, *Bartee*, 894 S.W.2d at 47–48 (Rickhoff, J., concurring) (noting that "the state has not defined wild animals so as to absolutely exclude from ownership all white-tailed deer within the

_____

the common law principle that ownership rights in wild animals could be acquired by dominion through legal captivity. As explained more fully below, the answer to that question, in my opinion, is no.

11

boundaries of the state" and that analogously "[j]ust because the state heavily regulates personalty such as handguns or automobiles, it does not follow that individuals may not own them").[7]

Moreover, although section 1.013 addresses whether fences affect the property status of wild animals, the provision does not speak to whether "captivity" affects the property status:

> This code does not prohibit or restrict the owner or occupant of land from constructing or maintaining a fence of any height on the land owned or occupied, and an owner or occupant who constructs such a fence is not liable for the restriction of the movement of wild animals by the fence. *The existence of a fence does not affect the status of wild animals as property of the people of this state.*

Tex. Parks & Wild. Code § 1.013 (emphasis added). Section 1.013 limits its discussion to the existence of fences and therefore does not prevent ownership through "captivity" and possession of wildlife. *See id.* The Code defines "[c]aptivity" as "the keeping of a breeder deer in an enclosure

---

[7] In an analogous situation from oil and gas law—where the rule of capture was adopted from the doctrine of animals ferae naturae—the Texas Supreme Court recognized that "the law of capture" is "recognized as a property right" that is "subject to regulation under the police power of this state" and "the right to be protected against confiscation under the Commission's oil and gas rules is not unconditional or unlimited." *Texaco, Inc. v. Railroad Comm'n*, 583 S.W.2d 307, 310 (Tex. 1979) (citing *Corzelius v. Harrell*, 186 S.W.2d 961 (Tex. 1945)); *see also Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 13 (Tex. 2008) ("The rule of capture is a cornerstone of the oil and gas industry and is fundamental both to property rights and to state regulation."); *City of San Marcos v. Texas Comm'n on Envtl. Quality*, 128 S.W.3d 264, 270–71 (Tex. App.—Austin 2004, pet. denied) ("The common-law rule of capture is based on the concept that ownership of a migratory resource occurs when one exerts control over it and reduces it to possession." (citing *Pierson v. Post*, 3 Cai. R. 175, 178, 1805 WL 781 (N.Y. Sup. Ct. 1805))); *but see Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 817 (Tex. 1974) (noting that *Murchison* rejected "the doctrine of minerals ferae naturae," which provides that when "extraneous gas which was 'turned loose' in the earth and wandered to another's land, the party injecting the stored gas ceased to be the exclusive owner of gas," and instead holding that "the extraneous gas injected for storage by Humble having assumed the character of personal property, remained its property" (citing *Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 879 (Tex. App.—Dallas 1962, writ ref'd n.r.e.))).

suitable for and capable of retaining the breeder deer it is designed to retain at all times under reasonable and ordinary circumstances and to prevent entry by another deer," *id.* § 43.351(3), but requires that "[a] single enclosure for breeder deer may not contain more than 100 acres," *id.* § 43.360. Importantly, however, the captivity must be under permit pursuant to the laws of the state—to acquire ownership in wild animals through captivity under common law, the animals must be removed from their natural liberty *legally*. *See Jones*, 45 S.W.2d at 614 (qualifying, on rehearing, original opinion's proposition that "wild animals become property removed from their natural liberty and made subjects of man's dominion" with the additional proposition "when such animals were 'legally' removed"); *see also Bilida v. McCleod*, 211 F.3d 166, 173 (1st Cir. 2000) (collecting cases and holding "that a claimant has no property interest in 'per se contraband,' *i.e.*, something that it is illegal merely to possess"); *Allen v. Pennsylvania Soc'y for Prevention of Cruelty to Animals*, 488 F. Supp. 2d 450, 466 (M.D. Pa. 2007) (recognizing that when animal "property was contraband" there could be "no legitimate property interest in the animals").

Thus, for example, section 1.103 would prevent a person lacking a permit from acquiring ownership in deer contained within high fences because the existence of a fence would not change the property status of the deer and any captivity or possession of the deer would be illegal. *See* Tex. Parks & Wild. Code §§ 43.364 ("All breeder deer and increase from breeder deer . . . may be held in captivity for propagation in this state only after a deer breeder's permit is issued by the department under this subchapter."), 63.002 (prohibiting possession of "a live game animal," including white-tailed deer, except for purposes "authorized by this code"); *see also Bartee*, 894 S.W.2d at 41 ("A wrongful reducing to possession of creature *feræ naturæ* cannot form the basis

13

of ownership." (quoting 3A C.J.S. *Animals* § 8 (1973))); *Bilida*, 211 F.3d at 173–74 ("State law makes illegal possession of raccoons taken from the wild without a permit issued by the Department. . . . This amounts to saying that, under state law, [the pet raccoon] could not be reduced to private ownership and lawfully possessed as property without a permit. *Needless to say, this would be a different case if Bilida did have a permit*, but she no longer claims ever to have had one." (emphasis added)); 3B C.J.S. *Animals* § 10 (2019) ("Wild animals reduced from a wild state *in compliance with the applicable law* become the property of the individual." (emphasis added)). But, on the other hand, the Code authorizes deer breeders with a valid permit to take captive-bred white-tailed deer pursuant to the statutory definition of "captivity," *see* Tex. Parks & Wild. Code § 43.357(a)(2), and legal captivity leads to the acquisition of property interests in wild animals under common law principles, *see, e.g.*, *Hollywood Park*, 261 S.W.3d at 140.

Accordingly, section 1.013—or, for that matter, the Code—is not inconsistent with acquiring property interests in captive-bred white-tailed deer under the common law. The provisions relied on by the Court do not represent "clear legislative intent" to deprive deer breeders of their rights under common law to acquire property rights in their breeder deer. *See Dealers Elec. Supply*, 292 S.W.3d at 660; *Cash Am.*, 35 S.W.3d at 16. It is not the existence of a fence that affects the property status of the breeder deer, but whether the deer are possessed in legal "captivity" in accordance with common law principles and pursuant to the statutory scheme—i.e., held under a legal permit and "in an enclosure [that does not contain more than 100 acres] suitable for and capable of retaining the breeder deer it is designed to retain at all times under reasonable and ordinary circumstances and to prevent entry by another deer." Tex. Parks & Wild. Code §§ 43.351(3), .360.

14

Because it is undisputed that Peterson legally held the breeder deer under permit and in captivity, I conclude that Peterson acquired a constitutionally protected property interest in the breeder deer and therefore respectfully dissent from the Court's contrary conclusion.[8]

## 2. *The Department's analysis*

The Department, on the other hand, relies on the legislature's 1991 enactment that statutorily defines "wild" to mean "a species, including each individual of a species, that normally lives in a state of nature and is not ordinarily domesticated." *Id.* § 1.101(4). The Department claims that deer breeders holding permits are bailees, and the people of the state, acting through the

---

[8] The Court also asserts, "The Legislature has specifically provided that a breeder's permit is valid for only a set amount of time" and "nothing in the statute contemplates that the breeder retains any rights over breeder deer after the permit expires or is revoked by the Department." *Ante* at ___. From this, the Court claims that "allowing private property rights to arise in breeder deer is incompatible with the Legislature's direction that breeder deer are 'held under a permit'" because "if breeder deer become private property, the owner's rights would not depend on the status of the permit because private property rights are 'not derived from the legislature.'" *Ante* at ___ (first quoting Tex. Parks & Wild. Code § 43.351(1), then quoting *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 535 (Tex. 2013)). However, although the Texas Supreme Court has "described the right to own private property" as "'not derived from the legislature and as preexisting even constitutions,'" *Kopplow Dev.*, 399 S.W.3d at 535 (quoting *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977)), it is "the common law and statutes [that] define these rights," *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 383 (Tex. 2012). The legislature can place conditions on what gives rise to and maintains the common law right to a property interest in breeder deer by statutorily defining what constitutes legal captivity—e.g., by requiring that breeder deer are held under permit. *See* Tex. Parks & Wild. Code §§ 43.351(1), (3), .360; *see also* 2 William Blackstone, *Commentaries on the Laws of England*, 393 (St. George Tucker ed., 2d ed. 1803) ("In all these creatures, reclaimed from the wildness of their nature, the property is not absolute, but defeasible . . . . But while they thus continue my qualified or defeasible property, they are as much under the protection of the law, as if they were absolutely and indefeasibly mine."). To the extent the Court is raising the hypothetical question of whether a deer breeder maintains ownership over the deer if the Department did not renew the breeder's permit, that question is not before the Court on this record and I therefore would not resolve it here.

15

Department, are the bailors. Deer breeders, as bailees, "have only a possessory right that they may assert against third parties who steal from them," "[t]hey do not have ownership or any rights superior to the State." The Department does not dispute that Texas common law and the statutory framework permitted private ownership through legal captivity and dominion of wild animals before 1991 because "the Legislature had not yet . . . defined 'wild' in terms of species." But the Department argues that with the 1991 statutory enactment of the definition of "wild" the state acquired absolute ownership of all wildlife, thereby making the common law rule "obsolete."

I agree with the Department that the common law provided for private ownership through legal captivity and dominion before 1991. But I disagree that the common law rule became "obsolete" in 1991. If private ownership is per se prohibited because "wild" is defined in terms of "species" and wild animals are therefore owned by the state regardless of confinement, then the later 1997 statutory enactment declaring that fences do not affect wild animals' status as property of the people of this state would be redundant and mere surplusage. *See* Tex. Gov't Code § 311.021 (providing that it is presumed entire statute is intended to be effective); *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016) ("[W]e consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage."). The fact that the legislature specified that the existence of fences does not affect property status, implies that other conditions—e.g., legal captivity under permit—could affect the property status of wild animals under common law principles, notwithstanding the 1991 statutory enactment defining "wild" in terms of species's characteristics. *See Mid-Century Ins. Co. of Tex. v. Kidd*, 997 S.W.2d 265, 273 (Tex.

1999) (recognizing "the doctrine of *expressio unius est exclusio alterius*, the maxim that the expression of one implies the exclusion of others").

Moreover, statutory provisions in the Texas Health and Safety Code expressly contemplate the ownership of wild animals by entities other than the state, which is contrary to the Department's theory that the state has absolute ownership in wild animals.[9] For example, section 822.103, enacted in 2001, contemplates that a person may "own . . . a dangerous wild animal" if "the person holds a certificate of registration for that animal issued by an animal registration agency."[10] Tex. Health & Safety Code § 822.103. But under the Department's theory, a person could not own a dangerous wild animal pursuant to section 822.103 because section 1.011(a) of the Code prevents any private ownership of any wild animal. *Compare id.*, *with* Tex. Parks & Wild. Code § 1.011(a). And the Department's theory would further upend current property expectations expressly contemplated by chapter 822—e.g., the ownership of wild animals by circus companies, biomedical research facilities, zoos and aquariums, and colleges and universities as

[9] "In the construction of an act, a court should consider all laws in pari materia, that is to say, all laws related to the subject of the act and the general system of legislation of which the act forms a part." *Reed v. State Dep't of Licensing & Regulation*, 820 S.W.2d 1, 2 (Tex. App.—Austin 1991, no writ); *see also State v. Bartee*, 894 S.W.2d 34, 45 (Tex. App.—San Antonio 1994, no pet.) (noting that courts may use statutory construction principle of in pari materia in determining legislative intent where "[s]tatutes that deal with the same general subject . . . or relate to the same person or thing or class of persons or things, are considered to be in pari materia although they contain no reference to one another, and although they may have been enacted at different times").

[10] The Department regulated the ownership of dangerous wild animals under chapter 12G of the Texas Parks and Wildlife Code until 1997, when the legislature repealed the chapter. *See* House Comm. on Cty. Affairs, Bill Analysis, Tex. H.B. 1362, 77th Leg., R.S. (2001). In 2001, the legislature passed subchapter E of chapter 822 of the Texas Health and Safety Code, regulating dangerous wild animals. *See* Act of April 26, 2001, 77th Leg., R.S., ch. 54, § 1, 2001 Tex. Gen. Laws 90, 90 (codified at Tex. Health & Safety Code §§ 822.101–.116); *see also* Tex. Health & Safety Code § 822.102(4) (defining "[d]angerous wild animal").

mascots. *See, e.g.*, Tex. Health & Safety Code § 822.102(a)(6), (8), (10), (11) (exempting these entities from subchapter E's requirements); *see also id.* §§ 822.107–13 (imposing requirements, restrictions, and liabilities on "[a]n owner of a dangerous wild animal").[11]

At issue here, then, is what it means for wild animals—as defined in terms of species's characteristics—to be "the property of the people of this state," *see* Tex. Parks & Wild. Code §§ 1.011(a), .101(4), and whether this precludes deer breeders from having private property rights through legally capturing white-tailed deer in compliance with the Code. "[P]roperty of the people of this state" is not defined by the Code, although our sister court has explained that "[t]he phrase 'property of the people of this state' has been interpreted . . . to mean that ownership of wild animals is in 'the state' or belongs to 'the state.'" *Hollywood Park*, 261 S.W.3d at 140. For this proposition, *Hollywood Park* cites *Bartee*, *see id.*, and *Bartee* states:

> With regard to the ownership of wild animals, we do not find that the various statutes enacted over the years have departed from the common law. The statutory phrase 'property of the people of this state' does not appear to have been interpreted by our courts. Despite its use in various statutes over the years, our courts have consistently referred to the ownership of wild animals as being in 'the state' or belonging to 'the state.'

894 S.W.2d at 42. But *Bartee* relies on three cases that are not interpreting the phrase "the property of the people of this state" in the statute, rather they are discussing common law principles. *See Wiley*, 597 S.W.2d at 5 ("The common law provides that animals ferae naturae belong to the state."

---

[11] Moreover, the Department's own rules contemplate private ownership of deer contrary to its theory of absolute state ownership. *See* 31 Tex. Admin. Code § 65.133(b) (Tex. Parks & Wildlife Dep't, General Provisions) ("[Buck deer held under a scientific breeder's permit] *remain private property* and may be recaptured[.]" (emphasis added)).

18

(citing *Jones*, 45 S.W.2d at 613–14)); *see also Dobie v. State*, 48 S.W.2d 289, 290 (Tex. Crim. App. 1932) (describing ownership of wild game as "in the state"); *Jones*, 45 S.W.2d at 613 (describing "general principles" of common law and stating "animals ferae naturae belong to the state"). And one of the cases—*Dobie*—qualifies its interpretation of public ownership as follows:

> The ownership of wild game, *so far as it is capable of ownership*, is in the state for the benefit of all its people in common, and it is within the police power of the state Legislature, subject to constitutional restrictions, to make such general or special laws as may be reasonably necessary for the protection of public rights in such game, and within such power is the right to regulate the method of taking or hunting game in the state.

*Id.* (emphasis added). *Dobie* effectively questions whether wild game is even "capable of ownership" and therefore does not stand for the proposition that wild game is owned by the state as the term "owned" is traditionally conceived.

Moreover, section 1.011(a) declares wild animals as property "of the people of this state," not *property of the state*. *See* Tex. Parks & Wild. Code § 1.011(a). Wild animals belong to the state as a sovereign, not as a proprietary owner, so far as wild animals are capable of ownership. *See, e.g.*, *Ex parte Blardone*, 115 S.W. 838, 840 (Tex. Crim. App. 1909) ("[T]he common ownership of game, which otherwise would remain in the body of the people, is lodged in the state, to be exercised, like all other governmental powers, *in the state in its sovereign capacity*, to be exercised in trust for the benefit of the people, and subject, of course, to such regulations and restrictions as the sovereign power may see fit to impose. Such regulations appropriately fall within the domain of the police power of the state." (emphasis added)); 3B C.J.S. *Animals* § 9 (2019) ("The State's ownership of wild animals is in its sovereign, as distinguished from its proprietary, capacity, and it

may regulate the taking and reduction to possession of wild animals."). Thus, we must inquire into what it means for a sovereign in its sovereign capacity to "own" wild animals, insofar as wild animals are capable of ownership, and whether this precludes private ownership.

"All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it." *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (quoting *McBride v. Clayton*, 166 S.W.2d 125, 128 (Tex. 1943)); *see also Cities of Conroe, Magnolia, & Splendora v. Paxton*, 559 S.W.3d 656, 669 (Tex. App.—Austin 2018, pet. filed) ("Although we generally ascribe the 'plain' or 'ordinary' meaning to the words chosen, we must also take account of . . . technical meanings apparent from statutory or jurisprudential context."). And "we may . . . look to federal cases for guidance on the meaning of terms not otherwise defined." *Paxton v. City of Dallas*, 509 S.W.3d 247, 258 (Tex. 2017).

Here, the development of the U.S. Supreme Court's understanding of the theory of public ownership of wild animals from *Geer v. Connecticut*, 161 U.S. 519 (1896), through *Hughes v. Oklahoma*, 441 U.S. 322 (1979), overruling of *Geer* is instructive,[12] and the legislature is presumed to have enacted the statutory definition of "wild" in 1991 with knowledge of the U.S. Supreme Court's jurisprudential statements as to public ownership of wild animals. In describing this transition, the U.S. Supreme Court explained that "[i]n expressly overruling *Geer* . . .

---

[12] I agree with the Court that *Hughes*, 441 U.S. at 335, does not control the validity of sections 1.011 and 1.101(4) because "*Hughes* concerned challenges to state statutes under the Commerce Clause of the United States Constitution" that are not at issue here. *Ante* at ___. Nevertheless, *Hughes* is persuasive in providing an understanding of how sections 1.011 and 1.101(4) should be interpreted, even though *Hughes* is not binding authority on this issue.

this Court traced the demise of the public ownership theory and definitively recast it as 'but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.'" *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 950–51 (1982) (quoting *Hughes*, 441 U.S. at 334); *see Hughes*, 441 U.S. at 341 & n.5 (Rehnquist, J., dissenting) (noting that State does not own wild creatures within its borders "in any conventional sense of the word" and even "[t]he *Geer* Court itself did not use the term 'ownership' in any proprietary sense"); *see also Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 385 (1978) (recognizing that "the States' interest in regulating and controlling those things they claim to 'own,' including wildlife, is by no means absolute"); *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 284 (1977) (positing that "[n]either the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture" and that the "'ownership' language" of earlier cases "must be understood as no more than a 19th-century legal fiction expressing the importance to its people that a State have power to preserve and regulate the exploitation of an important resource"); *Toomer v. Witsell*, 334 U.S. 385, 402 (1948) ("The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.").

The theory of public ownership of wildlife was questioned because there is no basis for state ownership as understood in the traditional proprietary sense. *See, e.g.*, *Baldwin*, 436 U.S. at 392 (Burger, C.J., concurring) ("A State does not 'own' wild birds and animals in the same way that it may own other natural resources such as land, oil, or timber."). The rationale underlying the

21

demise of the public ownership theory is summarily stated by Justice Holmes in *Missouri v. Holland*: "To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership." 252 U.S. 416, 434 (1920); *see Idaho ex rel. Evans v. Oregon*, 462 U.S. 1017, 1025 (1983) ("[N]o State has a pre-existing legal right of ownership in the fish[.]" (citing *Hughes*, 441 U.S. at 329–36)); *Geer*, 161 U.S. at 540 (Field, J., dissenting) ("The wild bird in the air belongs to no one, but when the fowler brings it to the earth and takes it into his possession, it is his property. He has reduced it to his control by his own labor, and the law of nature and the law of society recognize his exclusive right to it."); *Bartee*, 894 S.W.2d at 47 (Rickhoff, J., concurring) (noting "property in [wild] animals is acquired by occupance only" and "[a]s a general rule, wild fish, birds and animals are owned by no one[, p]roperty rights in them are obtained by reducing them to possession" (first quoting *Pierson v. Post*, 3 Cai R. 175, 1805 WL 781 (N.Y. Sup. Ct. 1805); then quoting *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978))); *see also Hollywood Park*, 2004 WL 390807, at *5 ("Deer, like fish, are *ferae naturae*, capable of ownership only by possession and control."); 3B C.J.S. *Animals* § 8 (2019) ("No one owns animals in the proprietary sense when they are in their natural habitat unless and until they are reduced to something akin to possession."); Richard A. Epstein, *The Modern Uses of Ancient Law*, 48 S.C. L. Rev. 243, 251 & n.28 (1997) (noting that *Geer* majority relied on "early Roman sources, which were duly mistranslated from res nullius to res communis"; "[t]he better conclusion was that because wild animals had no owner, they were considered unowned"); Carol M. Rose, *Possession as the Origin of Property*, 52 U. Chi. L. Rev. 73, 74 (1985) ("For the common law, *possession* or 'occupancy' is the origin of

property."). This explanation provides context to the qualification enunciated in the *Dobie* opinion that "ownership of wild game, so far is it capable of ownership, is in the state for the benefit of all its people in common." *Dobie*, 48 S.W.2d at 290.

In short, "[a] state does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture." *Toomer*, 334 U.S. at 402; *see also Baldwin*, 436 U.S. at 405 (Brennan, J., dissenting) ("The lingering death of the [state-ownership] doctrine as applied to a State's wildlife, begun with the thrust of Mr. Justice Holmes' blade in *Missouri v. Holland*, 252 U.S. [at 434] . . . and aided by increasingly deep twists of the knife in [intervening cases] finally became a reality in *Douglas v. Seacoast Products, Inc.*, [431 U.S. at 284].").

Following the understanding of "public ownership" enunciated in these cases, the statutory provisions declaring that wild animals are the "property of the people of this state" and defining "wild" to be a species's characteristic should not be understood as a traditional conception of ownership—i.e., proprietorship—over all animals within the species regardless of possession, but rather as a fiction expressive in legal shorthand of the importance to its people that the state has the power to preserve and regulate the exploitation of an important resource. *See Clajon Prod. Corp. v. Petera*, 854 F. Supp. 843, 851 (D. Wyo. 1994) (interpreting Wyoming's statutory declaration that state owns wildlife as "such a claim of ownership [that] is nothing more than a shorthand expression for preserving the state's power to regulate natural resources within its borders" (citing *Hughes*, 441 U.S. at 335–365)), *aff'd in part, appeal dismissed in part*, 70 F.3d 1566 (10th Cir. 1995);

*Simpson v. Dep't of Fish & Wildlife*, 255 P.3d 565, 573 (Or. Ct. App. 2011) (interpreting similar statute as "the state's property interest in wildlife is sovereign, not proprietary" and that it follows that "the state's property interest in wildlife under ORS 498.002(1) is not a proprietary or possessory interest that amounts to ownership, as ownership is commonly understood" (citing Or. Rev. Stat. § 498.002(1))); *Potts v. Davis*, 610 A.2d 74, 75 n.2 (Pa. Commw. Ct. 1990) (interpreting similar statute as "'ownership language'" that should be understood "'as no more than a 19th-century legal fiction'" (citing Pa. Cons. Stat. § 103; quoting *Douglas*, 431 U.S. at 284;)), *aff'd*, 610 A.2d 42 (Pa. 1992) (per curiam).[13]

Thus, I conclude that deer breeders with a permit have a property interest in their breeder deer under common law principles after legally taking the deer from their natural liberty and

---

[13] Moreover, if this Court were to construe section 1.011(a) of the Texas Parks & Wildlife Code taken to its extreme as giving the state actual ownership of all wild animals, rather than sovereign ownership, the Court's interpretation may have significant implications for takings or liability claims against the state for private property damaged by wildlife. *See Christy v. Hodel*, 857 F.2d 1324, 1334 (9th Cir. 1988) (collecting cases that have rejected a takings claim for private property damages by protected wildlife and noting federal government does not owe compensation because "[t]he federal government does not 'own' the wild animals it protects, nor does the government control the conduct of such animals" (citing *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 284 (1977)); *Clajon Prod. Corp. v. Petera*, 854 F. Supp. 843, 853 (D. Wyo. 1994) ("Because wild animals are owned, in the proprietary sense, by no one, including the state, it follows *a fortiori* that there has been no physical invasion of the plaintiffs' property which is attributable to the state" and thus "the state cannot be held accountable for the animals' presence or any forage damage that they cause, and therefore, the plaintiffs' physical takings claims must fail."), *aff'd in part, appeal dismissed in part*, 70 F.3d 1566 (10th Cir. 1995); *Metier v. Cooper Transp. Co.*, 378 N.W.2d 907, 914 (Iowa 1985) (interpreting statute that gives "title and ownership" of all wild game to the state as more properly "characterized as an ownership or title in trust, to conserve natural resources for the benefit of all Iowans" and "[t]o hold the State liable for all the conduct of its wild animals in every situation would pose intractable problems, and intolerable risks to the ultimate ability of the State to administer its trust"); *see also Union Pac. R.R. v. Nami*, 498 S.W.3d 890, 896–97 (Tex. 2016) ("Broadly speaking, and with various exceptions . . . a person who owns, possesses, or harbors a wild animal is strictly liable for its actions.").

24

keeping them in captivity pursuant to state law, while the state maintains sovereign "ownership"—as a legal fiction and distinguished from proprietary ownership.[14] *See Hughes*, 441 U.S. at 335–36 ("At the same time, the general rule we adopt in this case makes ample allowance for preserving, in ways not inconsistent with the commerce clause, the legitimate state concerns for conservation and protection of wild animals underlying the 19th-century legal fiction of state ownership."); *Munn v. State of Illinois*, 94 U.S. 113, 134 (1876) ("Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations."); *Bartee*, 894 S.W.2d at 47 (Rickhoff, J., concurring) ("Federal and state authority over wildlife is not based on ownership, but upon the state's police power to preserve and regulate an important resource." (citing *Toomer*, 334 U.S. at 402)).[15] In sum, sovereign "ownership" describes the state's authority to regulate wildlife for the benefit of the people in a manner consistent with our Constitution and the laws of our state, but sovereign ownership of wildlife is not proprietary

---

[14] Because I conclude that Peterson has a constitutionally protected property interest under common law, I do not address whether Peterson has a property interest under the terms of his permit as provided by statute. *See, e.g.*, Tex. Parks & Wild. Code § 43.357(a).

[15] *But see Anderton v. Texas Parks and Wildlife Dep't*, 605 F. App'x 339, 347 (5th Cir. 2015) (per curiam); *In re Wheeler*, 431 B.R. 158, 160 (Bankr. N.D. Tex. 2005). However, *Anderton* and *Wheeler* never considered how common law principles applied to taking ownership of wild animals in relation to the state. *Anderton*, 605 F. App'x at 348 n.4; *Wheeler*, 431 B.R. at 160. Moreover, the Andertons were not permit holders when the deer were killed, making possession illegal. *Anderton*, 605 F. App'x at 348 ("Nowhere do the statutes or regulations state that breeder deer become the property of a permit holder. Regardless, even if they did give ownership of breeder deer to permit holders, the Andertons were not permit holders when the deer were killed.").

25

ownership and therefore does not necessarily preclude an individual from acquiring ownership through legal possession and captivity of wild animals.[16]

---

[16] The Department makes two additional arguments. First, it argues that "[t]he State's conservation of natural resources is premised on public ownership," citing section 59(a) of article 16 of the Texas Constitution. But section 59(a) of the Texas Constitution is not self executing and instead requires that "the Legislature shall pass all such laws as may be appropriate thereto." Tex. Const. art. XVI, § 59(a); *see City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798, 803 (Tex. 1955) (holding that section 59(a) "was not self enacting" and "[b]y the very terms of the Amendment the duty was enjoined upon the Legislature to implement the public policy found therein"; "[n]o such duty was or could have been delegated to the courts" but "[i]t belongs exclusively to the legislative branch of the government"); *see also Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 782 (Tex. 2005); *Hendee v. Dewhurst*, 228 S.W.3d 354, 373 (Tex. App.—Austin 2007, pet. denied). Thus, even assuming that the Conservation Amendment was premised on public ownership, it is not the province of the judiciary to apply the Conservation Amendment and declare public ownership of natural resources under that Constitutional provision.

Second, the Department argues that the Texas Supreme Court "held that when the State grants use of a public resource through a permit, the State retains 'rights as the owner of the' resource." *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971). But in *Wright*, "the permittees received only the right to use the water for beneficial purposes," i.e., "to divert water for irrigation purposes from the Rio Grande River." *Id.* at 644, 647. Here, in contrast, the Code authorizes a "holder of a valid deer breeder's permit" to "sell, transfer to another person, or hold in captivity live breeder deer for the purpose of propagation or sale," a significantly greater portion of the bundle of rights constituting property. Tex. Parks & Wild. Code § 43.357(a)(2); *see Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 383 (Tex. 2012) (listing core rights in "bundle of property rights" and noting "[w]e have never required a person to possess the full, unfettered bundle of property rights for a thing to be classified as their property"). And, as I have shown above, the common law provides for ownership of wild animals through legal captivity. Moreover, the issue in *Wright* concerned the forfeiture of water rights from nonuse of the permit—i.e., the permittees no longer appropriated any water for beneficial use from the "corpus of the water" that "[t]he State was at all times the owner." 464 S.W.2d at 647–48. Thus, the *Wright* Court held that "Permittees at no time were vested with the right of non-use of the water for an indefinite period of time. At all relevant times, the State had rights as the owner of the water." *Id.* at 648. In contrast, Peterson held the breeder deer in legal captivity, was granted more than just a usufructuary right in his permit, and never stopped relying on his permit to continue breeding his deer consistent with the laws of the state. *Wright* is inapposite here.

26

## B. What process is due?

Having established that Peterson has a constitutionally protected property interest, I now turn to what process is due and whether the trial court properly granted the Department's motion for summary judgment and denied Peterson's motion for summary judgment as to Peterson's due process claims. As an initial matter, I note that "[t]he constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances." *Harrell v. State*, 286 S.W.3d 315, 319 (Tex. 2009) (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). Thus, an essential component of a due process claim is determining the amount of process due given the circumstances. To determine the amount of process due, three *Eldridge* factors are balanced: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 319–20 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 334 (1976)).

Peterson's motion for summary judgment, however, did not cite, analyze, or provide evidence of these factors establishing the amount of process due, given his circumstances. Nor did Peterson address these factors on appeal. Because he did not establish the amount of process due, Peterson failed to meet his burden of establishing as a matter of law that he is entitled to summary judgment on his procedural due process claims. *See* Tex. R. Civ. P. 166a; *City of Richardson*, 539 S.W.3d at 259. The district court did not err in denying Peterson's motion for summary judgment.

27

In addition to arguing that Peterson has no constitutionally protected property interest, the Department in its motion for summary judgment argued that "even if [Peterson] had a protected interest and even if he had been denied a transfer permit, the deer-breeder industry's interest in prompt permits would outweigh the incidental benefit of the burdensome procedures Peterson demands: a contested-case hearing for transfer permits."[17] Assuming without deciding that the Department had sufficiently established that the *Eldridge* factors weigh against Peterson's proposed procedures, the Department nevertheless has not met its summary judgment burden to establish that the procedures already established under the Code and the CWD Rules satisfy the amount of process due. In other words, demonstrating that Peterson's putatively proposed procedures are unduly burdensome and more than the amount of process due does not meet the Department's burden to

---

[17] The Department also argued that Peterson lacks standing because he testified in his deposition that the Department never denied his transfer permit and therefore his alleged injury is not "concrete and particularized, actual or imminent, not hypothetical." *See DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008). Peterson responded that he obtained the necessary transfer permits "because he tested to the level required by the CWD [R]ules to obtain such permits" and if he had not properly tested and then transferred deer "he would have been subject to criminal sanctions" and would "have jeopardized his [deer breeder] permit." *See* 31 Tex. Admin. Code §§ 65.89 (Penalties), .99(c) (Violations and Penalties). Peterson also submitted an affidavit that he "had to reduce the size of [his] herd [from 100 deer to 56] because of the . . . new CWD testing rules and because the CWD [R]ules, the Parks & Wildlife questioning of ownership, and the restrictions on release sites have combined to depress the market for breeder deer" and that he would have a "loss that is more like $7,000.00 to $20,000.00" to comply with the testing requirements. By alleging that the Code and CWD Rules restricted Peterson's use of his property and caused him to incur additional expenses, Peterson has demonstrated "the required actual, concrete, and particularized infringement of [his] legally protected interests necessary for standing." *See Stop the Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919, 928 (Tex. App.—Austin 2010, no pet.) (collecting cases; holding that alleging ordinance restricted use of property, caused additional expenses, and damaged or destroyed market satisfied standing requirement; and noting plaintiff is not required to allege "deprivation of a 'vested right' constituting a due-process violation to demonstrate the requisite infringement of a 'legally protected interest'").

establish as a matter of law that it is entitled to summary judgment because the current established

process under the Code and CWD Rules satisfies the amount of process due.[18]   Because the

---

[18] The Department argued in its motion that a "'statewide transport ban' applied to all deer breeders would not violate due process" because "Peterson was afforded the process he was due during the enactment of the legislation and adoption of the rules following notice-and-comment procedures," citing *Lee v. Texas Workers' Comp. Comm'n*, 272 S.W.3d 806, 818 (Tex. App.—Austin 2008, no pet.).  Before this Court, it asserts that "[e]ven if we assume that Peterson owns the breeder deer the State has allowed him to possess, he still would have no due-process claim, because he has received all the process he was due concerning his ability to transfer deer." The reasoning, according to the Department, is that the *Lee* Court held that procedural due process rights "do not attach where the action resulting in the alleged deprivation of property rights is legislative, rather than administrative"; "[w]hen the legislature enacts a law that affects a general class of person, those persons have received procedural due process by the legislative process itself"; and the same principle applies to administrative procedures when the legislature provides the agency with discretion and chooses not "to grant further administrative procedures."  *See id.* at 818.

However *Lee* concerned an entitlement benefit created by a statute—i.e., Lee's admission to an agency's approved doctor list required for eligibility to treat injured patients and to receive payment under the workers' compensation system.  *See id.* at 809 (citing Tex. Labor Code § 408.022); *see also id.* at 816–17.  Thus, *Lee* concerned an alleged property interest that was "created and . . . defined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms."  *Id.* at 817.  The *Lee* Court then noted the principle that "[w]here, however, the legislature leaves final determination of which eligible individuals receive benefits to the unfettered discretion of administrators, no constitutionally protected property interest exists." *Id.* at 817–18 (citing *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 567 (1972)). Concluding that the statute provided the agency with discretion to decide whether a doctor's application will be approved, the *Lee* court held that "there is no constitutionally protected property interest in being admitted to the approved doctor list under the Texas Workers' Compensation Act." *Id.* at 819.

Here, in contrast, the property interest is not an entitlement benefit created by statute, but one arising out of longstanding common law principles, although regulated by statute.  Nor does the Department have "unfettered discretion" in restricting that interest.  Although the Department is authorized to establish "procedures and requirements for the purchase, transfer, sale, or shipment of breeder deer," Tex. Parks & Wild. Code § 43.357(b)(5), the legislature also provided that a "holder of a valid deer breeder's permit may . . . transfer to another person . . . live breeder deer for the purpose of propagation or sale," *id.* 43.357(a)(2); *see* Tex. Gov't Code § 311.016(1) ("'May' creates discretionary authority or grants permission or a power.").  *Lee* does not control here.  By citing *Lee* and asserting that due process was satisfied through "the enactment of the legislation and adoption of the rules following notice-and-comment procedures," the Department did not meet its burden to establish that it was entitled to summary judgment on Peterson's due process claims.

Department failed to meet its burden to establish as a matter of law that it was entitled to summary judgment on Peterson's due process claims, I conclude that the district court erred in granting the Department's summary judgment motion and would reverse the order as to that issue.[19] *See* Tex. R. Civ. P. 166a; *City of Richardson*, 539 S.W.3d at 259.

## C. Attorney's fees

As to the question of attorney's fees, I agree with the Court that the district court had jurisdiction to award attorney's fees under the Uniform Declaratory Judgment Act (UDJA), including against Bailey. But "[w]here the extent to which a party prevailed has changed on appeal, our practice has been to remand the issue of attorney fees to the trial court for reconsideration of what is equitable and just." *Morath v. Texas Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 885 (Tex. 2016) (remanding attorney's fee issue "as to all parties"); *see* Tex. Civ. Prac. & Rem. Code § 37.009; *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637–38 (Tex. 1996). Because my disposition on appeal would substantially affect the district court's judgment, I would reverse the district court's order on attorney's fees and remand so that the trial court can address what attorney's fees, if any, should be awarded under the UDJA. *See Morath*,

---

[19] On appeal, the Department also challenges jurisdiction over Peterson's due process claims under the UDJA as redundant with Peterson's APA claims. *See Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 746 (Tex. App.—Austin 2014, pet. dism'd) ("[A] trial court lacks jurisdiction over an additional claim under the UDJA that would merely determine the same issues and provide what is substantively the same relief that would be provided by the other statutory remedy."). Nevertheless, when a party challenges both rules and statutes, as Peterson did, the "UDJA claims are not barred by the redundant remedies doctrine" because "the [plaintiffs] cannot attack the constitutionality of the statutes pursuant to Section 2001.038 of the APA." *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 80 (Tex. 2015).

490 S.W.3d at 885; *Barshop*, 925 S.W.2d at 637–38; *Bank of N.Y. Mellon v. Soniavou Books, LLC*, 403 S.W.3d 900, 907 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

### III. CONCLUSION

For these reasons, I concur with the Court's holding affirming the dismissal of Peterson's declaratory judgment and ultra vires claims, but respectfully dissent from affirming the district court's order granting the Department's summary judgment motion, awarding attorney's fees to the Department, and denying Peterson's motion for attorney's fees. I would instead reverse and remand as to those issues.

_____
Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith

Filed:   June 28, 2019